[Crim. No. 20313. Sept. 25, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
IVORY WAYNE JOHNSON, Defendant and Appellant.

COUNSEL

Paul Halvonik, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, Martin Stein and Cheryl Lutz, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Theodora Berger, Shunji Asari and John A. Saurenman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—This is a companion case to *People* v. *Wheeler* (1978) *ante,* page 258 [148 Cal.Rptr. 890, 583 P.2d 748]. Like *Wheeler,* the defendant in this case is black, the victim white, and the prosecutor struck all blacks from the jury by means of peremptory challenge. Unlike *Wheeler,* however, defendant herein need not bear the burden of showing that the

prosecutor was intentionally removing all blacks from the jury because of their race: the prosecutor freely admitted as much, and gave a reason for doing so. The sole issue is the sufficiency of that reason.

Defendant forced his way into the apartment of Janice Jared. After robbing and raping her, he tied her up and left. About that time Ray Wildt, who worked at a motorcycle shop across the street, looked up and saw a black man walk from Mrs. Jared's house, then down the street. Meanwhile Mrs. Jared freed herself, ran to a window, and screamed for help. As Wildt came towards her she shouted, "Ray, I have just been raped." Wildt called, "Was it the nigger?" and she answered that it was.

Wildt then drove off on a motorcycle in search of the assailant. A short distance away he saw a black man wearing clothing similar to that of the man he had observed earlier; the man entered a car, and Wildt followed. Although he was unable to see the license number, another witness had noted it as the car drove away.

A police officer responded to a call for assistance based on descriptions of the car and suspect furnished by both these witnesses. He spotted the car and gave chase until the driver pulled to a stop and escaped on foot. Defendant's fingerprints were found inside the car, and Mrs. Jared identified him as her assailant from a group of photographs and again at trial.

In the midst of voir dire a black prospective juror, Arthur C. Jarrett, failed to return after a lunch break. In discussing the situation with the court and defense counsel the prosecutor stated that in any event he had intended to exercise a peremptory challenge against Mr. Jarrett if he were called to the jury box. Defense counsel noted that the prosecutor had previously struck the only other black prospective juror, and declared that "if the record shows a systematic intent on the part of [the prosecutor] to exclude any black jurors without any other rationale, I want the record to reflect that." The court declined to let the record so state, but the prosecutor candidly admitted that he intended to use his peremptory challenges "As long as I have the ability on any black juror that is called to sit in this case."

The prosecutor subsequently explained that "since as I have stated on the record my intention to exclude black jurors, I think I should have the right to say why." He then gave as his reason the fact that certain witnesses had made racially prejudicial statements that might be dis-

closed to the jury, "which I would think would make it very difficult for any black person to be totally objective about it [i.e., the case] either consciously or subconsciously . . . ."

After the jury was sworn defendant moved for a mistrial on the ground that the prosecutor's admitted systematic exclusion of black veniremen on the ground of race violated his right to a jury drawn from a representative cross-section of the community under both the Sixth Amendment and the California Constitution. In response the prosecutor reiterated that "As long as I had peremptory challenges I intended to peremptorily excuse black jurors in this case because I felt that some of my witnesses, based on the language used in the arrest reports and the crime reports which I am privy to, would show a prejudice against the black people and I felt that there was no way to voir dire that I could with a hundred percent accuracy identify a black person who could with objectivity sit on a jury where he might hear his race referred to as, for instance, 'nigger.' And so . . . it was my intention to excuse every black juror that I could." The court denied the motion without comment, and the all-white jury proceeded to hear the case.

In *Wheeler* we hold that when a party makes a prima facie showing that his opponent is using peremptories to strike from the jury members of a cognizable group on the ground of group bias alone, the burden shifts to the latter to justify such challenges on grounds unrelated to group affiliation, i.e., to relate reasons of specific bias. Because the prosecutor herein openly acknowledged that he was deliberately striking all black jurors on the ground of their race, he voluntarily shouldered the burden of justification and we may proceed to appraise his reason.

■ Upon careful consideration we find the reason to be insufficient as a matter of law. The prosecutor knew that one or more of his key witnesses had referred to defendant as "the nigger," and that such testimony would in all probability come out at trial. In fact, the incident in question could well be viewed as an important link in the chain of identification tying defendant to the offenses charged. The prosecutor was apparently concerned that a black juror might not be able to weigh objectively the testimony of witnesses who had used so derogatory a racial epithet. However, rather than trying to determine by voir dire which individual black juror was likely to be thus affected, the prosecutor simply elected to exercise a blanket challenge against all of them. This is decision-making by racial stereotype, a technique that should be anathema in our courts.

It is true, as the prosecutor complained, that voir dire would not have identified "with a hundred percent accuracy" jurors who were partial on this ground. But no voir dire on an issue of bias is likely to be that exact; and unless such an attempt is made in good faith, the result will be—as here—that some prospective jurors will be struck from the panel not because they are individually prejudiced against the parties or their witnesses but merely because such bias is presumed from the fact of their race. This is precisely the kind of group bias that *Wheeler* holds constitutionally insufficient to support a peremptory challenge.

Indeed, the facts of this case illustrate the importance of the representative cross-section requirement recognized and enforced in *Wheeler*. The prosecutor was concerned about the effect of this testimony on black jurors—but he apparently gave no thought to its effect on white jurors. Yet however strongly they might feel they could rise above racial considerations, we cannot believe that each and every one of the white jurors would be immune from emotional impact on hearing the defendant described as "the nigger." Given the long and unfortunate history of the use of that epithet by the white majority of our nation to deprecate the black minority,[1] its appearance in a court of law will inevitably inject some degree of bias—whether conscious or unconscious—into the deliberations of the white jurors.

That bias will go unchecked, however, if the prosecutor is permitted to remove all black jurors from the case by peremptory challenges. It is primarily those jurors who can bring to the jury room the different perspective needed to counteract the pervasive poison of racial prejudice in our society. As we explain in *Wheeler,* this is the high purpose of the representative cross-section rule. It was manifestly frustrated in the case at bar.

As the conviction must be set aside because of the denial of defendant's right to an impartial jury under article I, section 16, of the California Constitution, we need not reach defendant's remaining contentions.

The judgment is reversed.

Bird, C. J., Tobriner, J., Manuel, J., and Newman, J., concurred.

---

[1]The etymology of "nigger" clearly reveals it to be the product of race antagonism. The first published use of the term noted in the Oxford English Dictionary dates from 1786, but Mencken asserts "the word must be older." (Mencken, The American Language (4th ed. 1938) p. 296, fn. 3.)

**RICHARDSON, J.**—I respectfully dissent. As indicated in my dissenting opinion in the companion case of *People* v. *Wheeler* (1978) *ante,* at page 258 [148 Cal.Rptr. 890, 583 P.2d 748], I believe that the majority has placed an improper burden on trial counsel to justify their exercise of peremptory challenges and has, thereby, hampered counsel's ability to impanel an impartial jury. Further, an unnecessary responsibility has also been placed on the trial court in weighing the challenges to counsels' use of the peremptories. The present case furnishes a vivid illustration of the unfortunate effect of such a burden.

The prosecutor knew that one or more of his key witnesses had previously referred to defendant as "the nigger" and that such testimony would, in all probability, be elicited at trial. The prosecutor said that he intended to use his peremptory challenges to excuse as many black jurors as possible because he felt that their ability to consider the testimony of such witnesses objectively would be inevitably impaired. The majority finds such use of peremptory challenges constitutionally impermissible. I disagree.

There can be little doubt that the vicious and demeaning racial epithet here involved, distasteful as it is to the population generally, falls with particular force and intensity on and produces additional revulsion in the group to which it is directed. The question therefore is not, as the majority characterizes it, whether all black jurors without exception will be hostile to a prosecution witness who uses such language, but whether nonblack jurors will be less apt to feel hostility. I do not believe, however much we may wish the contrary, that those who are not the target of the slur can feel the insult so keenly. Human nature being what it is, I would think it probable that those who are not members of a group directly affected by a scurrilous reference would be likely to judge the testimony of their detractor with greater impartiality. To conclude otherwise, in my opinion, is to ignore reality and to engage in a legal fiction which substitutes a surface appearance of impartiality for its substance.

I would affirm the judgment.

Clark, J., concurred.