[Crim. No. 21618. Oct. 23, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
MELVIN TURNER, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., and Quin Denvir, State Public Defenders, under appointment by the Supreme Court, Steffan Imhoff, Joseph Levine and Donald L. A. Kerson, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert F. Katz, Andrew D. Amerson, Lauren E. Dana and John S. Harrel, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190.1 et seq.). The record demonstrates that the prosecutor used his peremptory challenges to strike Black prospective jurors in a racially discriminatory manner for the apparent purpose of obtaining an all-White jury to try this Black defendant for crimes against White victims. The trial judge com-

pounded the error by failing in his duty to carefully evaluate the prosecutor's proffered explanations for these challenges in light of all the circumstances of the case. This patent violation of defendant's right to trial by a jury drawn from a representative cross-section of the community, guaranteed by article I, section 16, of the California Constitution, compels us to reverse the judgment. (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].)

In a recent landmark decision, the United States Supreme Court has also condemned such abuse of the peremptory challenge as a violation of yet another fundamental constitutional guarantee, the right to equal protection of the laws under the Fourteenth Amendment to the federal Constitution. (*Batson* v. *Kentucky* (1986) 476 U.S. — [90 L.Ed.2d 69, 106 S.Ct. 1712].)

Defendant and another were jointly charged with robbing and murdering George S. Hill, Jr., and Joella Champion, and with stealing Hill's car. By way of special circumstances it was alleged that each murder was committed in the course of a robbery and that each defendant was guilty of both murders. Defendant's case was severed for trial. The jury convicted defendant on all counts and found the special circumstance allegations true. At the penalty phase the jury returned a verdict of death. .

Because the dispositive issue arises from the jury selection process that took place before the introduction of any evidence, we need recite only the facts relevant to that issue. (See, e.g., *People* v. *Chadd* (1981) 28 Cal.3d 739, 743-744 [170 Cal.Rptr. 798, 621 P.2d 837].)

At the time of the crimes defendant was a young Black man on parole. The two persons he was accused of murdering were White, and both were well known and respected members of the community.[1] At least three Blacks were in the venire summoned to hear the case; all three were called to the jury box, examined, and passed for cause. The prosecutor then struck all three Blacks from the jury by peremptory challenge. Defendant objected vigorously but in vain: the jury that ultimately tried him was all White. He contends that on the record of this case the prosecutor's peremptory challenge of all three Blacks violated his right to a jury drawn from a representative cross-section of the community. His point is supported by settled law.

In a now-familiar series of decisions beginning with *People* v. *Wheeler, supra,* 22 Cal.3d 258, we have made it clear that the courts of

---

[1]George S. Hill, Jr., was a local physician and surgeon; Joella Champion was a teacher, and owned the airplane in the hangar where the crimes took place. During voir dire several prospective jurors said they knew her personally or had friends in common.

this state cannot tolerate the abuse of peremptory challenges to strip from a jury, solely because of a presumed "group bias," all or most members of an identifiable group of citizens distinguished on racial, religious, ethnic, or similar grounds. Such an abuse, we have repeatedly held, violates the defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. (*Id.* at pp. 276-277; accord, *People* v. *Johnson* (1978) 22 Cal.3d 296, 299 [148 Cal.Rptr. 915, 583 P.2d 774]; *People* v. *Allen* (1979) 23 Cal.3d 286, 292 [152 Cal.Rptr. 454, 590 P.2d 30]; *People* v. *Hall* (1983) 35 Cal.3d 161, 166-167 [197 Cal.Rptr. 71, 672 P.2d 854]; *People* v. *Motton* (1985) 39 Cal.3d 596, 600 [217 Cal.Rptr. 416, 704 P.2d 176]; *People* v. *Trevino* (1985) 39 Cal.3d 667, 679-682 [217 Cal.Rptr. 652, 704 P.2d 719]; see also *People* v. *Fuller* (1982) 136 Cal.App.3d 403, 408 [186 Cal.Rptr. 183].) We need not recite yet another time the reasons of law and policy for this well-settled rule; they are exhaustively reviewed in the cited opinions (see also *Com.* v. *Soares* (1979) 377 Mass. 461 [387 N.E.2d 499, 508-518]).

■ In addition, the United States Supreme Court has recently denounced the same pernicious practice as a violation of the federal equal protection clause. In *Batson* v. *Kentucky, supra,* 476 U.S. — [90 L.Ed.2d 69], a Black defendant was tried and convicted by an all-White jury after the prosecutor exercised peremptory challenges against the only four Blacks in the venire. The defendant had unsuccessfully objected on the dual grounds of violation of his Sixth Amendment right to a jury drawn from a representative cross-section of the community and his Fourteenth Amendment right to equal protection of the laws. Reserving decision on the first ground, the United States Supreme Court struck down the practice on the second ground and overruled its contrary decision in *Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824].

The high court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (*Batson* v. *Kentucky, supra,* 476 U.S. —, at p. — [90 L.Ed.2d at p. 83].) The court reasoned that "Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try," but also reflects unfairly on the fitness and impartiality of those who are struck from the jury for that reason. (*Id.* at p. — [90 L.Ed.2d at p. 81].) Indeed, "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." (*Ibid.*) "In view of the heterogeneous population of our nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no

citizen is disqualified from jury service because of his race." (*Id.* at p. —
[90 L.Ed.2d at p. 89].)

Although the high court did not directly address the contention that the
practice also violates the defendant's right to a representative jury, it rec-
ognized the concerns protected by that right. Thus the court observed that
"The petit jury has occupied a central position in our system of justice by
safeguarding a person accused of crime against the arbitrary exercise of
power by prosecutor or judge. . . . For a jury to perform its intended function
as a check on official power, it must be a body drawn from the community.
[Citations.] By compromising the representative quality of the jury, dis-
criminatory selection procedures make 'juries ready weapons for officials
to oppress those accused individuals who by chance are numbered among
unpopular or inarticulate minorities.'" (*Id.* at p. — & fn. 8 [90 L.Ed.2d
at p. 81].)

The United States Supreme Court then adopted a procedure for enforcing
its new rule: the burden is first on the defendant to make a prima facie
showing of intentional discrimination in the prosecution's use of its pe-
remptory challenges; if the trial court finds he has made such a showing,
the burden shifts to the prosecutor to justify the challenges on nondiscrim-
inatory grounds; and the trial court must then determine if the discrimination
is proved. (*Id.* at p. — [90 L.Ed.2d at pp. 88-89].) Finally, the court rejected
the state's contention that its new rule would either undermine the purpose
of the peremptory challenge or create serious administrative difficulties.
(*Ibid.*) This is essentially the same procedure, of course, that we adopted
in *Wheeler.* (22 Cal.3d at pp. 280-282.)

Unable now to attack the *Wheeler* rule on either state or federal consti-
tutional grounds, the Attorney General argues instead that its procedural
requirements were not met in the case at bar. We may therefore focus on
those requirements.

### A. *Prima Facie Case of Group Discrimination*

Under *Wheeler,* "If a party believes his opponent is using his
peremptory challenges to strike jurors on the ground of group bias alone,
he must raise the point in timely fashion and make a prima facie case of
such discrimination to the satisfaction of the court. First, . . . he should
make as complete a record of the circumstances as is feasible. Second, he
must establish that the persons excluded are members of a cognizable group
within the meaning of the representative cross-section rule. Third, from all
the circumstances of the case he must show a strong likelihood that such
persons are being challenged because of their group association rather than

because of any specific bias." (22 Cal.3d at p. 280, fn. omitted; accord, *Batson* v. *Kentucky, supra,* 476 U.S. at p. — [90 L.Ed.2d at pp. 88-89].) The Attorney General first contends that defendant failed to make a prima facie case of group discrimination. The record is otherwise.

Two of the first twelve prospective jurors called to the box, Delores Buchanan and Thomas Chappell, were Black. They were questioned on voir dire by the court, defense counsel, and the prosecutor, and neither was challenged for cause. The prosecutor, however, exercised peremptory challenges first against Mr. Chappell and then against Ms. Buchanan. Immediately after the latter was excused the court adjourned for the day; when proceedings resumed the next morning, defense counsel addressed the court as follows:

"At this time I would like to make a motion for mistrial based on the district attorney's systematic exclusion of blacks on this jury.

"As I look out [on] the 90 or so jurors that we had originally, and in view of my earlier motion, that blacks were not adequately represented in the panel,[2] I would like it on the record that there are a total, as I look out in the audience, of two blacks. There were two blacks in addition to that on the jury that were selected by lot.

"Mr. Chappell and Mrs. Buchanan were black.

"And that by peremptory challenge, the district attorney has excluded Mr. Chappell and Mrs. Buchanan. And, as such, I feel that the constitutional rights of the defendant have been impinged upon and he would not be able to get a fair trial.

"And also that it is a systematic exclusion. And that's the basis of my motion."

In response, the court turned to the prosecutor and said, "Mr. Martin, would you like to explain?" After the prosecutor voiced certain reasons for these two challenges—to be discussed below—the court denied the motion without comment.

■ Except when the *Wheeler* rule operates, of course, a peremptory challenge is one "for which no reason need be given" (Pen. Code, § 1069).

---

2Prior to trial defendant had unsuccessfully moved to quash the venire as a whole on the ground that it did not constitute a representative cross-section of the community. He renews that contention on appeal, but in view of our disposition of the *Wheeler* issue we need not reach it or any of defendant's numerous other contentions.

It follows that unless the trial court in the present case had made at least an implied finding of group discrimination, it would have had no basis for asking the prosecutor to "explain" the reasons for his peremptory challenges. We may therefore fairly deem that the inquiry implied such a finding, and shifted the burden of justification to the prosecutor. Indeed, after *Wheeler* it is disingenuous to treat such inquiries as anything else. For example, in *People* v. *Trevino, supra,* 39 Cal.3d 667, 668, we similarly observed that "The trial court called upon the prosecutor to explain his exclusion of the Spanish surnamed jurors," and we proceeded to evaluate the sufficiency of the ensuing explanations. (See also *People* v. *Hall, supra,* 35 Cal.3d 161, 165.)[3]

■ Such a finding, moreover, was amply supported by the record. There is no doubt that Blacks constitute a cognizable group for *Wheeler* purposes. (22 Cal.3d at p. 280, fn. 26.) As of the time of the motion, the prosecutor had used two of his first five peremptory challenges to strike the only Black prospective jurors in the box. Yet Mr. Chappell and Ms. Buchanan apparently had only their race in common: they were of different sexes and marital status, lived in different communities, and engaged in different occupations. On voir dire neither had expressed any views indicating partiality to the defense; on the contrary, both prospective jurors "had backgrounds which suggested that, had they been white, the prosecution would not have peremptorily excused them." (*People* v. *Allen, supra,* 23 Cal.3d 286, 291, fn. 2.) Thus both had been victims of crime—armed robbery in the case of Ms. Buchanan, auto burglary in the case of Mr. Chappell—and Ms. Buchanan had a friend who was a policeman. Finally, as noted above, not only was defendant a member of the excluded group of prospective jurors, but both his alleged victims were members of the group to which the remaining jurors belonged. The combination of these factors establishes a prima facie case of group discrimination. (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 280-281, 283; *People* v. *Allen, supra,* 23 Cal.3d at p. 294; *People* v. *Motton, supra,* 39 Cal.3d at pp. 606-608; *People* v. *Trevino, supra,* 39 Cal.3d at pp. 687-688.)[4]

Subsequent events confirm this conclusion. The jurors called to replace Mr. Chappell and Ms. Buchanan were White. The prosecutor soon accepted

---

[3]We are not to be understood, however, as approving of rulings by implication on this important issue. Rather, in every case in which a *Wheeler* motion is made the trial court should expressly rule on the sufficiency of the showing of a prima facie case of group bias.

[4]These circumstances also distinguish the case on which the Attorney General relies (*People* v. *Rousseau* (1982) 129 Cal.App.3d 526 [179 Cal.Rptr. 892]), where the defendant's attempt to make a prima facie case of group discrimination "was limited to his statement that 'there were only two blacks on the whole panel, and they were both challenged by the district attorney.'" (*Id.* at p. 536; cf. *People* v. *Fuller, supra,* 136 Cal.App.3d 403, 422.)

the jury as constituted, and declined four opportunities to exercise additional peremptory challenges.[5] After another prospective juror was excused by the defendants, however, Cleaseiana Shepherd was called to the box. She was Black. The prosecutor passed for cause without asking her a single question, then immediately struck her from the jury by peremptory challenge. At the next recess defendant renewed his motion for mistrial on the ground that the prosecutor was systematically excluding all Blacks from the jury. Before the court could rule on the issue of a prima facie case, the prosecutor insisted on giving a reason for his action. The court again denied the motion without comment, and jury selection continued. No more Blacks were called; the prosecutor exercised no more peremptory challenges, declining six opportunities to do so after he challenged Ms. Shepherd. As noted, the jury thereafter sworn to try defendant was all White.

When these events are taken together with the prosecutor's removal of the only other Blacks on the jury in the circumstances discussed above, we have no doubt that defendant made the prima facie case of group discrimination required by *Wheeler* and implied in the inquiry of the trial court herein.

### B. *Prosecutor's Burden of Justification*

We further held in *Wheeler* that "[i]f the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone." (22 Cal.3d at p. 281.) We explained that the showing "need not rise to the level of a challenge for cause," but must persuade the court that the peremptory challenges in question were exercised "on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein." (*Id.* at pp. 281-282; accord, *Batson* v. *Kentucky, supra,* 476 U.S. at p. — [90 L.Ed.2d at pp. 88-89].)[6]

---

[5]We may assume the prosecutor was satisfied with the jury rather than expressing reluctance to use up his remaining peremptory challenges: at the time he accepted the jury he had used only eight such challenges, and thus had a total of eighteen left. (Pen. Code, § 1070, subd. (a).)

[6]To the extent that a trial court's ruling on the proffered explanation of a prosecutor turns on the latter's credibility, we agree with the United States Supreme Court that "a reviewing court ordinarily should give those findings great deference." (*Batson* v. *Kentucky, supra,* 476 U.S. at p. —, fn. 21 [90 L.Ed.2d at p. 89].) Our decisions demonstrate, however, "ordinarily" does not mean "inevitably": in some cases the reviewing court may conclude that the explanation is inherently implausible in light of the whole record. And even when there is no doubt of the prosecutor's good faith, the issue whether a given explanation constitutes a constitutionally permissible—i.e., nondiscriminatory—justification for the particular peremptory challenge remains a question of law.

In three cases following *Wheeler* we have been called upon to review reasons offered by a prosecutor to rebut a presumption of group bias, and the rulings of trial courts accepting those reasons. In *People* v. *Johnson, supra,* 22 Cal.3d 296, a companion case to *Wheeler,* we impliedly accepted as true the prosecutor's explanation but held it insufficient as a matter of law because it amounted to "decision-making by racial stereotype" (*id.* at p. 299).

In *People* v. *Hall, supra,* 35 Cal.3d 161, the prosecutor offered an explanation purportedly based on the backgrounds of the particular jurors he had challenged. We stressed that in such cases the trial court must "satisfy itself that the explanation is genuine. This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.'" (*Id.* at pp. 167-168, quoting from *Wheeler* at p. 282 of 22 Cal.3d.)

Applying that rule, we held the trial court had not seriously attempted to evaluate the prosecutor's proffered explanation "for the purpose of determining whether it was bona fide." (*Id.* at p. 168.) Going further, we found that "In fact, the record itself contains ample reason to suspect that it was not." (*Ibid.*) We pointed in particular to instances in which the prosecutor challenged Black jurors assertedly because of certain factors in their background but did not challenge White jurors having similar factors.

Finally, in *People* v. *Trevino, supra,* 39 Cal.3d 667, we held insufficient an even more elaborate set of reasons advanced by the prosecutor. (*Id.* at pp. 689-691, fn. 22.) We began by admonishing that the trial court "must not consider the proffered justifications in terms of the district attorney's "'judgment" or "sincerity,'" but must determine whether the 'ground of challenge was a specific bias on the part of the individual juror.'" (*Id.* at p. 688, quoting from *Wheeler* at p. 284, fn. 32, of 22 Cal.3d.) As in *Hall,* we emphasized the prosecutor's disparate treatment of the challenged and the unchallenged groups on similar facts (39 Cal.3d at pp. 691-692) and concluded that the majority of the challenged jurors "were excluded for reasons other than those presented to the court." (*Id.* at p. 692.) Indeed, we found the proffered explanations "scarcely more believable than those we rejected in *Hall*" (*ibid.*).

We apply a similar analysis to the case at bar, and begin with the challenges of Mr. Chappell and Ms. Buchanan.[7] Although the trial took place long after we had recognized the prosecution's burden of justification in *Wheeler, Johnson,* and *Allen,* the prosecutor answered the court's request for an explanation with the remark, "I don't think I have to give the court any reasons at this time." Nevertheless he went on to give his reasons, and we may therefore review them. With regard to Mr. Chappell, the prosecutor said: "I think the court will remember that the male black that was excused was a truck driver. He had a great deal of difficulty in even understanding the questions that were being given. His answers—the questions had to be repeated several times.

"THE COURT: Which ones of these are you referring to?

"MR. MARTIN: That's the man sitting at the top row—

"THE COURT: No. Which questions?

"MR. MARTIN: Those which the court asked and which I asked and defense counsel asked.

"This case has a tremendous amount of circumstantial evidence, very complicated instructions. And in a case of this nature, I felt that he would not be able to sit and give both sides a fair trial."

■ We note that the prosecutor began his explanation by emphasizing that Mr. Chappell "was a truck driver," as if that fact were a talisman whose invocation would somehow make the discrimination disappear. On the contrary, the remark suggests yet another impermissible group bias behind this challenge, because trial by a jury from which working-class people are systematically excluded is also a violation of the representative cross-section rule. (*Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1184-1185, 66 S.Ct. 984, 166 A.L.R. 1412]; *People* v. *White* (1954) 43 Cal.2d 740, 752-754 [278 P.2d 9].) The cited cases refute

[7]In this task we received no assistance from the brief of the Attorney General. The defendant's opening brief launched a lengthy factual and legal attack on the reasons given by the prosecutor for the challenges in question; but the Attorney General did not respond in his brief to any of defendant's arguments on the issue, and contented himself with saying only that these prospective jurors were excluded because "they might be dysfunctional in terms of jury dynamics." We need not attempt to translate this bit of psychological jargon; our concern is with the explanation the prosecutor gave to the trial court, not with a theory subsequently devised by the Attorney General for consumption on appeal. (Cf. *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 [108 Cal.Rptr. 585, 511 P.2d 33], and cases cited [court will not consider new theories offered on appeal to justify warrantless search and seizure].)

any implication that truck drivers as a class are not intelligent enough to be jurors. And the record refutes any such implication as to Mr. Chappell individually.

To begin with, contrary to the prosecutor's assertion Mr. Chappell had no difficulty understanding and answering the questions put to him either by defense counsel or by the prosecutor himself. The former inquired briefly whether Mr. Chappell had been the victim of crime, and the latter asked him a dozen questions designed to determine whether he could be a fair and impartial juror. Some of the prosecutor's questions were difficult to follow.[8] Yet Mr. Chappell's answers to all of them were direct and appropriate, and suggested no lack of intelligence whatever.

The court posed two sets of questions to the prospective jurors. In one set it asked the first 12 jurors called to the box—including both Mr. Chappell and Ms. Buchanan—to state in turn where they lived, what work they did, if they were married and if so where their spouse worked. Although Mr. Chappell was the last juror to speak, his answers—like those of Ms. Buchanan—were wholly responsive and given in the same order as the original questions.

The court also asked each of the prospective jurors a set of four questions designed to identify persons subject to a challenge for a cause in capital cases on grounds of conscientious or religious scruples about the death penalty. Apparently out of an excess of caution, the questions were at once highly formalized, conceptually complex, and relentlessly repetitive.[9] Mr.

---

[8]For example, the prosecutor asked Mr. Chappell: "And if you imagine in your mind that you have friends, other truck drivers and friends of your family, friends of long standing from school, grammar school or high school, and during conversation with them after this trial or that you start thinking about that during the trial as to what they might criticize you, now if you're thinking about that during the trial as you sit there now, do you feel that notwithstanding, despite that you would be able to give the People a fair trial and the defendant a fair trial uninfluenced by emotion and pity?"

Notwithstanding the convoluted syntax of the question, Mr. Chappell promptly answered it in the affirmative.

[9]The four questions put to Mr. Chappell, and with minor variations to all the prospective jurors, ran as follows:

1. "Mr. Chappell, do you have such a conscientious opinion or religious conviction regarding capital punishment that you cannot make a conscientious decision on the guilt or innocence of the defendant regardless of the evidence presented?"

2. "And do you have such a conscientious opinion or religious conviction regarding capital punishment that you could not make an impartial decision as to the truth of the special circumstances herein involved, to wit, the killing of a human being during the course of a robbery; and, number two, the killing of another human being during or at or about the same time of the killing of the first human being?"

3. "And do you have such a conscientious opinion or religious conviction regarding the death penalty that if you found the defendant guilty of murder in the first degree and that

Chappell answered the first and second questions in the negative and the third and fourth in the affirmative. The court pointed out that the latter two answers were inconsistent, explained the responsibilities of jurors in the penalty phase of a capital trial, and repeated the third and fourth questions; this time Mr. Chappell answered both in the negative, and was passed for cause.

We need not speculate on whether persons of normal intelligence might likewise have been confused by these questions to the point of answering yes when they meant no: as defense counsel correctly argued to the court in criticizing the prosecutor's explanation, the record is replete with similar mistakes by other prospective jurors. Sadie Dean, the juror preceding Mr. Chappell in the voir dire, first answered yes to question No. 4; but after hearing the court's explanation to Mr. Chappell, she admitted her answer was the exact opposite of what she meant, and, like Mr. Chappell, changed it to a negative.[10] Again, prospective juror Betty Wallace first answered yes to question No. 2, which inquired whether she had scruples preventing her from reaching an impartial decision on the truth of the special circumstance allegations. Upon further questioning by the court, however, it appeared that Ms. Wallace had misunderstood the question: she had interpreted "special circumstances" to mean the fact that one of the victims was a friend of hers. After the mistake was explained to her, she changed her answer to a negative.

Prospective juror Ann Kaufman, like Mr. Chappell, first answered yes to questions No. 3 and No. 4. The court pointed out that she had answered both questions in the affirmative. She replied that she thought the two

---

[sic] the special circumstances or circumstance to be true that [sic] you would automatically find the penalty to be life imprisonment without the possibility of parole?"

4. "Do you have such a conscientious opinion or religious conviction, Mr. Chappell, regarding the death penalty that if you found the defendant guilty of murder in the first degree and that [sic] the special circumstance or circumstances herein alleged to be true, that [sic] you would automatically find the penalty to be death?"

[10]Thus, immediately after Mr. Chappell changed his answers, the following colloquy occurred:

"PROSPECTIVE JUROR DEAN: I think I answered the last question wrong, also. I thought I was doing it right, but evidently I wasn't—

"THE COURT: Now from my explanation to Mr. Chappell you believe you were somewhat confused?

"PROSPECTIVE JUROR DEAN: Yes.

"THE COURT: If I asked you that question about the death penalty, if you found the defendant guilty of murder in the first degree and the special circumstances herein alleged to be true, that you would automatically find the penalty to be death, you had answered, 'Yes.'

"And you—

"PROSPECTIVE JUROR DEAN: Feel I should say no.

"THE COURT: You should say no?

"All right. Thank you. Okay."

questions were the same. The court explained the difference between them, and Ms. Kaufman said, "I'm sorry. I thought you were asking for the death penalty both times." She then changed her answer to question No. 3 to a negative.[11]

We have reviewed these portions of the voir dire in some detail because they cast grave doubt on the plausibility of the prosecutor's explanation for his peremptory challenge of Mr. Chappell: not only were other prospective jurors also momentarily confused by the questions asked by the court on this topic, but when one of those jurors (Wallace) was later called to the box the prosecutor accepted the jury as constituted and took no steps to remove her.

■ The prosecutor's stated reason for his peremptory challenge of Ms. Buchanan was even more unsatisfactory. In its entirety, the explanation was: "As far as the excusing of the woman, I don't remember exactly, but I think it was something in her work as to that she was doing that from our standpoint, that background was not—would not be good for the People's case. And I excused her, along with quite a few other people, too, for the same reason."

To begin with, the assertion that "something in her work" would "not be good for the People's case" is so lacking in content as to amount to virtually no explanation. If such vague remarks were held to satisfy the prosecution's burden of rebutting a prima facie case of group discrimination, the defendant's constitutional right to trial by a jury drawn from a representative cross-section of the community could be violated with impunity.

In any event, the record contains "ample reason to suspect" that the proffered explanation was not bona fide. (*People v. Hall, supra,* 35 Cal.3d 161, 168.) The prosecutor's only knowledge of Ms. Buchanan's work was her statement to the court that she was employed as a "supervising hospital

---

[11]Because Mrs. Kaufman adhered to her affirmative answer to question No. 4—meaning that she believed in an automatic death penalty—the court excused her for cause.

When we compare the answers given by other jurors on counsel's voir dire with the answer they gave to the court, it appears that several must also have misunderstood question No. 3. That question asked in effect whether the prospective jurors had scruples that would prevent them from voting to impose the death penalty in any case. Both Madeline Paddock and Madeline Robalik, for example, answered no to that question when it was posed to them by the court. Yet on counsel's voir dire Ms. Paddock declared she could not in fact vote for the death penalty, and was excused by stipulation; in turn, Ms. Robalik said on counsel's voir dire, "I'm against the death penalty," and because of that attitude she agreed she would vote for a conviction of second degree rather than first degree murder in order to avoid facing a death penalty decision. She was promptly excused by prosecution peremptory challenge.

unit coordinator" at the Los Angeles County-USC Medical Center: although the prosecutor took her on voir dire, he asked no questions about her job. Absent such inquiry, we can conceive of no reason why Ms. Buchanan's position in hospital administration should give rise to a specific bias against the prosecution. On the contrary, in the case at bar it would be far more likely to cause her to be sympathetic to the prosecution, because one of the victims was a prominent and well respected doctor on the staff of several hospitals in the area.

Equally unclear and unpersuasive is the prosecutor's further remark that he excused Ms. Buchanan "along with quite a few other people, too, for the same reason." Again the explanation was so vague as to be of little assistance; presumably the prosecutor meant that other challenged jurors also worked in medically related jobs. But there is still no explanation why, on the facts of this case, such a background would dispose prospective jurors against rather than in favor of the prosecution. Moreover, the prosecutor in fact excused only two other jurors who worked in the medical field,[12] and the record demonstrates that at least one of those two was actually excused because of her scruples against the death penalty.[13] Indeed, it was apparently for the latter reason that the prosecutor excused most of the six White jurors he challenged peremptorily.[14]

■ Finally, the prosecutor offered the following explanation of his peremptory challenge of the third Black prospective juror: "it was clear from what Mrs. Shepherd said that she could not sit impartially because she was a mother of children, and, therefore, the People instead of asking her further questions about that took her on her word, and rather than further bring out for all the jury to hear that she couldn't sit because she had children, the People excused her."

---

[12]Evelyn Mueller was a registered nurse; Dorothy Diamond was a semiretired "medical technologist nurse." On the other hand, the prosecutor did not challenge Benjamin White, whose wife worked part time as a registered nurse; White later became foreman of the jury.

[13]Ms. Mueller answered "probably" when asked by the court if she would automatically vote *against imposing the death penalty.* On voir dire the prosecutor asked in effect whether she would feel compelled to vote for life imprisonment if she reached the penalty phase of the deliberations, and she replied, "I think that's exactly what I'd do." The prosecutor then asked defense counsel to stipulate that Ms. Mueller could be excused for cause; counsel declined to do so, and the prosecutor immediately exercised a peremptory challenge against her.

[14]In addition to Ms. Mueller, Ms. Robalik declared "I'm against the death penalty" and could not vote to impose it; Helen O'Rell disclosed on voir dire that she was not clear in her mind "whether capital punishment is just," and she had "reservations" about the penalty; when asked if she would automatically vote for life imprisonment, Janet Real answered only, "I don't think so"; and when asked if she would not be swayed by the fact that a guilty vote would bring on a penalty trial, Margaret Weldon replied, "I'd have to do what's in my heart."

What Ms. Shepherd actually said, however, was much more ambiguous. The court inquired on voir dire whether, if it were to ask her "the same general questions" that were put to the other prospective jurors, "would you answer those general questions pretty much the same as they have?" When she said no, the court asked how her answers would differ. She replied, "I'd be too emotionally [*sic*] as a mother." The court directed the reporter to read back the answer. It did not ask Ms. Shepherd for a clarification, however, and immediately turned her over to counsel for their voir dire. Each declined to ask any questions, whereupon the court addressed the prospective juror one more time: "Do you think Miss Shepherd, you could listen to the evidence in this case, the instructions of law, and attempt to reach a just verdict based on the facts as you understand them to be and the law as I state it to you?" She replied in the affirmative, and the court said, "Fine." Nevertheless the prosecutor immediately struck her from the jury by peremptory challenge.

A prosecutor's failure to engage Black prospective jurors "in more than desultory voir dire, or indeed to ask them any questions at all," before striking them peremptorily, is one factor supporting an inference that the challenge is in fact based on group bias. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 281; accord, *People* v. *Allen, supra,* 23 Cal.3d 286, 294.) The inference is not rebutted here by the prosecutor's claim that Ms. Shepherd could not sit impartially because she was a mother; that assertion is belied by the juror's assurance to the court that she would be able to listen to the evidence and reach a just verdict on the facts and the instructions. The Attorney General relies on Ms. Shepherd's cryptic remark that "I'd be too emotionally [*sic*] as a mother." On this record, however, we will never know what the remark actually signified. In light of Ms. Shepherd's statement that she could indeed serve as a juror, she may have meant only that she was uncomfortable with the nature of the case—a feeling that other jurors naturally expressed as well.[15] At the very least, the remark called for a few follow-up questions that would have soon clarified the matter. Rather than asking such questions, however, the prosecutor immediately removed the last Black prospective juror from the box by peremptory challenge. In these circumstances we have little confidence in the good faith of his proffered explanation.

■ Finally, as to all three of the challenges the inadequacy of the prosecutor's reasons was compounded by the court's apparent acceptance of those reasons at face value. In each instance the court listened to the prosecutor without question and promptly denied the motion without com-

---

[15]We note that a number of White prospective jurors also had children but were not challenged by the prosecutor.

ment. As we have seen, however, the prosecutor's explanations were either implausible or suggestive of bias. They therefore "demanded further inquiry on the part of the trial court" (*People* v. *Hall, supra,* 35 Cal.3d at p. 169), followed by a "sincere and *reasoned*" effort by the court to evaluate their genuineness and sufficiency in light of all the circumstances of the trial (*id.,* at p. 167, italics added). Each step is "imperative, if the constitutional guarantee is to have real meaning" (*ibid.*).

We conclude that as in *Trevino* the prosecution failed to sustain its burden of showing that the challenged prospective jurors were not excluded because of group bias (39 Cal.3d at p. 693), and as in *Hall* the court failed to discharge its duty to inquire into and carefully evaluate the explanations offered by the prosecutor (35 Cal.3d at pp. 168-169).

The error is prejudicial per se. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 283, and cases cited.) In a related context, the United States Supreme Court recently upheld the reversal of a California murder conviction 23 years after the crime because Blacks had been systematically excluded from the grand jury that returned the indictment. (*Vasquez* v. *Hillery* (1986) 474 U.S. 254 [88 L.Ed.2d 598, 106 S.Ct. 617].) Declaring such discrimination to be "a grave constitutional trespass" and "wholly within the power of the State to prevent," the high court concluded that reversal was "the only effective remedy for this violation" and "is not disproportionate to the evil that it seeks to deter. If grand jury discrimination becomes a thing of the past, no conviction will ever again be lost on account of it." (*Id.,* at p. — [88 L.Ed.2d at p. 608, 106 S.Ct. at p. 633].) In these circumstances, moreover, reversal is automatic: "When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm." (*Id.,* at p. — [88 L.Ed.2d at p. 609, 106 S.Ct. at p. 623].) Such discrimination "undermines the structural integrity of the criminal tribunal itself," and "The overriding imperative to eliminate this systemic flaw in the charging process, as well as the difficulty of assessing its effect on any given defendant, requires our continued adherence to a rule of mandatory reversal." (*Id.,* at p. — [88 L.Ed.2d at p. 609, 106 S.Ct. at p. 624].) This reasoning is even more applicable, of course, to the systematic exclusion of Blacks from the jury that actually tried and convicted the defendant in the case at bar.

The judgment is reversed.

Bird, C. J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**PANELLI, J.,** Concurring.—I reluctantly agree that on the record before us, reversal is compelled under our opinion in *People* v. *Wheeler* (1978) 22

Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] as well as the very recent United States Supreme Court decision in *Batson* v. *Kentucky* (1986) 476 U.S. — [90 L.Ed.2d 69, 106 S.Ct. 1712].

In this case, however, the trial court failed to expressly rule that defendant had met his burden of showing a prima facie case of the exclusion of jurors by peremptory challenge on the ground of group bias alone. In the absence of such a ruling, the prosecutor had no notice that he was *required* to justify his peremptory challenges. The trial court merely asked the prosecutor: "Mr. Martin, would you like to explain?" The prosecutor's statement that he did not think he had "to give the court any reasons at this time" reflected his belief that the burden had not yet shifted. I am not at all surprised, then, that the prosecutor's subsequent "off-the-cuff" reasons for the peremptory challenges fell short of establishing to our satisfaction a proper race-neutral justification for his peremptory challenges. This is particularly true here since the challenges to Jurors Buchanan and Chappell were made on a Friday and it was not until the following Monday that the *Wheeler* motion was made. Because of the importance of creating an adequate record for review when a *Wheeler* motion is made, we have said that the point should be raised in timely fashion. (*Wheeler, supra,* 22 Cal.3d at p. 280.) However, trial courts should be sensitive not only to the timeliness of the motion but also, as pointed out in the majority opinion, to the need for an express ruling on the sufficiency of the motion. Lacking a clear ruling on the sufficiency of the prima facie showing, which was absent here, prosecutors may be uncertain as to the necessity for justifying their use of peremptory challenges to particular jurors.

Lucas, J., concurred.

Respondent's petition for a rehearing was denied December 18, 1986.