The appellant, John Lionel Neal, Jr., was convicted of capital murder, in violation of § 13A-5-40(a)(4), Code of Alabama 1975, as charged in the indictment. He was sentenced to death.
On February 16, 1987, Mrs. Wilmer Underwood was found dead in the kitchen of her Foley, Alabama house. An autopsy revealed that Mrs. Underwood had been beaten to death. Mrs. Underwood's house had been ransacked and her Motorola Quasar television was missing. Fingerprints, matching the appellant's prints, were found on a number of items in Mrs. Underwood's house.
The appellant was arrested in Canada and he was returned to Alabama. After the appellant was arrested, his wife contacted law enforcement officials and informed them that the appellant had stored the missing television in a travel trailer in Covington, Louisiana. A warrant to search the trailer was obtained and executed on the trailer and a Motorola Quasar television was found inside. The serial number on the television matched the number on Mrs. Underwood's missing television.
The appellant contends that the trial court committed reversible error by denying his motion for a mistrial on the basis of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, the appellant argues that the prosecutor violated Batson by using his peremptory strikes to remove 4 blacks and a hispanic from the jury because of their race and ethnic origin.
In this case, the State used 4 of its 14 peremptory strikes to remove 4 of the six blacks from the jury venire (D.L., A.M., B.S.M., and C.S.) In addition, the state used another peremptory strike to remove a hispanic (M.S.). The appellant made a timely objection to the State's use of its peremptory strikes. Without stating whether the appellant had established a prima facie case of discrimination, the trial court required the State to explain its reasons for striking the black and hispanic veniremembers.
 "[W]hen the trial court calls upon the prosecutor for an explanation, without expressly finding a prima facie case, we will proceed directly to evaluate the sufficiency of the ensuing explanation. Where the trial court requires the prosecution to explain its peremptory challenges without first finding the existence of a prima facie showing of discrimination, we may fairly conclude that 'the enquiry implied such a finding, and shifted *Page 1349 
the burden of justification to the prosecutor.' People v. Turner, 42 Cal.3d 711, 719, 230 Cal.Rptr. 656, 660, 726 P.2d 102, 106 (1986)."
Williams v. State, 548 So.2d 501, 504 (Ala.Crim.App. 1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159,103 L.Ed.2d 218 (Ala. 1989); McLeod v. State,581 So.2d 1144 (Ala.Cr.App. 1990); Currin v. State,535 So.2d 221 (Ala.Crim.App.), cert. denied,535 So.2d 225 (Ala. 1988); Avery v. State, 545 So.2d 123
(Ala.Crim.App. 1988). After the State provided its reasons for its peremptory strikes, the trial court found that the reasons offered by the State were "sufficiently race free reasons for the strikes" and that the State did not intentionally exclude all blacks from the jury because 2 of the 12 jurors in the case were black. (R. 615.)
"We may only reverse the trial judge's determination that the prosecution's peremptory challenges were not motivated by intentional discrimination if that determination is clearly erroneous." Ex parte Branch, 526 So.2d 609, 625 (Ala. 1987). However, from our review of the record, we conclude that the determination by the trial court was clearly erroneous because the State failed to meet its burden of providing clear, specific, and legitimate race-neutral reasons for striking several of these veniremembers as required by Batson
and Branch.
Regarding veniremember D.L., the prosecutor explained:
 "[I]t became known that she was from the Bay Minette area and . . ., in the opinion of the State, had a very weak personality relative to the questions asked by the State. She would vacillate back and forth when asked by Mr. Bolton, as I remember, and when she was asked by the State, she would vacillate in that regard. I felt since the nature of this case required a person of strong personality, that was the reason that the State of Alabama struck D.L. She was a black female, as I recall." (Emphasis added.)
During voir dire, the following exchange with D.L. took place:
"THE COURT:
"D.L.
"(Jury venireman in.)
"THE COURT:
 "Ms. L., if you would, just have a seat right there and answer Mr. Bolton's questions.
"MR. BOLTON: [Defense counsel]
 "Ms. L., have you ever heard anything about this?
"THE JURY VENIREMAN:
"No, this is the first time.
"MR. BOLTON:
 "First time. I think she and Mr. M. are the only two. That is all I have.
"MR. WHETSTONE: [Prosecution]
"No questions.
"THE COURT:
"Thank you very much." (R. 210.)
These are the only questions individually asked of D.L. From this exchange and the record as a whole as well, we see no indication that D.L. vacillated back and forth as the prosecutor alleged. Furthermore, the prosecutor indicated that D.L. had been questioned by the State. However, there is no evidence in the record that the State questioned D.L. at any time.
Regarding veniremember A.M., the prosecutor explained:
 "A.M. was the real, real young black male, as I recall, and was not very well educated, as I remember, had difficulty understanding the concepts that the State asked him and had difficulty understanding the concepts that Mr. Bolton asked him. This case will be a complicated case involving insanity defenses and we felt that he would not make a good juror in this matter for that reason." (Emphasis added.)
During voir dire the following exchange with A.M. occurred:
"THE COURT:
 "Mr. M., if you would just have a seat right there, please, sir. And if you would answer Mr. Bolton's questions or Mr. Whetstone's.
"MR. BOLTON:
 "Mr. M., you live here in Bay Minette, I believe. *Page 1350 
"THE JURY VENIREMAN:
"Yes, sir.
"MR. BOLTON:
 "Mr. M., had you ever heard anything about this case before you came up here today?
"THE JURY VENIREMAN:
"No, sir.
"MR. BOLTON:
 "Do you keep up with things in the other part of the County like this?
"THE JURY VENIREMAN:
"Not too much, no.
"MR. BOLTON:
"I think that is all, Your Honor.
"MR. WHETSTONE:
"I have [no] questions of Mr. M. Thank you.
"THE COURT:
 "Mr. M., if you would just step out and don't tell anybody what we asked you or what was said.
"(Jury venireman out.)" (R. 230.)
The following colloquy also occurred during voir dire:
"MR. BOLTON:
 "Are any of you a member of a church or an organization, ecumenical or any other denominational member of a church group, that either supports or opposes capital punishment?
"THE JURY VENIREMEN:
"(Indicate by raising hands.)
"MR. BOLTON:
"Mr. M.?
"THE JURY VENIREMAN:
 "I am a member of the Holiness Church and they oppose because killing is a sin.
"MR. BOLTON:
"Whether it be by government or an individual?
"THE JURY VENIREMAN:
"That is what I was taught." (R. 142.)
Upon examination of the record, we find that A.M. was not even questioned by the State and there is no evidence that A.M. had difficulty understanding any "concepts" as the State contends.
In each of these two instances, the State alleged that part of its reasoning for striking these veniremembers stemmed from questions asked of these jurors by the State. The record reveals that the State did not specifically address any questions to either of these veniremembers.
 " 'An examination of the voir dire questioning shows a complete lack of meaningful questions directed to the black venirepersons and related to the reasons given for striking them. "A prosecutor's failure to engage black prospective jurors 'in more than desultory voir dire, or indeed to ask them any questions at all,' before striking them peremptorily, is one factor supporting an inference that the challenge is in fact based on group bias.' " People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 111, 230 Cal.Rptr. 656 (1986).' Avery v. State, 545 So.2d 123, 127 (Ala.Cr.App. 1988)."
Parker v. State, 568 So.2d 335, 337 (Ala.Crim.App. 1990). The allegations made by the State with regard to its reasons for striking D.L. and A.M. "are not only wholly without support in the record, but are directly refuted by it." Exparte Yelder, [Ms. 1910345, August 14, 1992], 1992 WL 192836 (Ala. 1992). Therefore, "we are compelled to conclude that the explanations advanced by the State for its challenges of these veniremembers represent no more than a pretext for racial discrimination." Yelder.
Additionally, the explanation offered by the State as to one other black veniremember is highly suspicious in light of its reasons for striking D.L. and A.M.
The State explained its peremptory strike of C.S. as follows:
"MR. WHETSTONE:
 "My notes on Ms. S. are somewhat limited, Your Honor. As I remember, she was an extremely young black female. That she exhibited, I thought, very little knowledge of what was going on or understanding of what was going on when the voir dire took place and did not feel like she could grasp the complicated nature of this case. That was the reason she was struck."
During actual voir dire, the following exchange with C.S. took place: *Page 1351 
"THE COURT:
"C.S.
"(Jury venireman in.)
"THE COURT:
 "Ms. S., if you would, please come up and have a seat in this chair, please, ma'am. And if you would, answer any questions that Mr. Bolton may have for you or Mr. Whetstone may have for you.
"MR. BOLTON:
"Good morning.
"THE JURY VENIREMAN.
"Hi.
"MR. BOLTON:
 "Ms. S., have you been living in the Bay Minette area for the last three years?
"THE JURY VENIREMAN:
"(Nods head affirmatively.)
"MR. BOLTON:
"When did you first hear about this case?
"THE JURY VENIREMAN:
 "It has been way back. I didn't pay it no attention.
"MR. BOLTON:
 "Back when it first happened, you heard about the case back when it first happened?
"THE JURY VENIREMAN:
"In the newspaper.
"MR. BOLTON:
"Did you hear anything on TV about it?
"THE JURY VENIREMAN:
"I don't watch TV that much.
"MR. BOLTON:
"Did you hear anything on the radio about it?
"THE JURY VENIREMAN:
"No, sir.
"MR. BOLTON:
 "Do you remember anything about what you may have heard?
"THE JURY VENIREMAN:
"No, like I said, I ain't paid no attention.
"MR. BOLTON:
 "Did you hear anything about anybody being arrested for the crime?
"THE JURY VENIREMAN:
 "It's been way back, like I said, I didn't pay it no attention.
"MR. BOLTON:
"What newspaper do you read?
"THE JURY VENIREMAN:
"Baldwin Times.
"MR. BOLTON:
 "Have you heard anything about the case recently?
"THE JURY VENIREMAN:
"No, sir.
"MR. BOLTON:
 "About any sort of hearings here in Court or competency hearings or anything like that?
"THE JURY VENIREMAN:
"No, sir.
"MR. BOLTON:
 "Did you read any of the newspaper articles last week about this trial?
"THE JURY VENIREMAN:
 "I just get them, you know, for looking at the want ads.
"MR. BOLTON:
 "Oh. Have you ever heard anybody talking about this case?
"THE JURY VENIREMAN:
"No, sir.
"MR. BOLTON:
"Have you discussed the case with anybody?
"THE JURY VENIREMAN:
"No, sir.
"MR. BOLTON:
 "Ms. S., what is your opinion or feelings on the death penalty?
"THE JURY VENIREMAN:
 "Well, if you do a crime, you know, at all, you know, depends on what you did in the crime.
"MR. BOLTON:
 "Would you consider yourself for the death penalty or against the death penalty?
"THE JURY VENIREMAN:
"I am for it.
"MR. BOLTON:
 "Judge Partin mentioned to the group yesterday which you were part of that insanity, mental disease, defect, may be an issue in this case. *Page 1352 
 "Would you have any problems considering that as a defense in this case?
"THE JURY VENIREMAN:
"No, sir.
"MR. BOLTON:
"I think that is all. Thank you, Ms. S.
"MR. WHETSTONE:
"No questions."
(R. 394.)
Although the individual voir dire of C.S. was somewhat more lengthy and extensive than for the previous two veniremembers, the State's explanation is, nevertheless questionable. The State merely explained that its notes on this veniremember were "limited" and that it felt that she would be unable to "grasp the complicated nature of this case." The State's reasons for this strike were certainly not clear and specific. In fact, the State failed to question C.S. at all. From the voir dire examination of C.S., it appears that she would have been a favorable juror for the State because she was in favor of the death penalty and she indicated that she knew little about this case. Although the State's reasons for striking C.S. may have been sufficient if C.S. had been the only veniremember struck because of allegations of difficulties in understanding the complexity of this case. However, in light of the State's deficient explanations for striking D.L. and A.M., we believe that the State's reason for striking C.S. was also inadequate.
In this case, we conclude that the State failed to meet its burden of overcoming the presumption that the strikes of these veniremembers were racially motivated. Thus, the judgment is reversed and this cause remanded to the trial court for proceedings not inconsistent with this opinion. We pretermit discussions of the other issues raised on appeal due to our decision in this opinion.
REVERSED AND REMANDED.
All the Judges concur.