Padgett's Fourth and Fifth Assignments of Error are overruled.

## V

Padgett's First and Third Assignments of Error having been sustained, the judgment of the trial court will be reversed, and this cause will be remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

WOLFF, P.J., and BROGAN, J., concur.

The STATE of Ohio, Appellee,

v.

HAIRSTON, Appellant.

[Cite as *State v. Hairston* (1990), 67 Ohio App.3d 341.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 56866.

Decided April 16, 1990.

*John T. Corrigan*, Prosecuting Attorney, and *Richard J. Bombik*, Assistant Prosecuting Attorney, for appellee.

*Beverly J. Pyle*, for appellant.

PATTON, Chief Justice.

Defendant-appellant Nicholas Hairston ("defendant") appeals from his convictions for three counts of rape, one count of aggravated burglary, and one count of theft.

Louanne Allen testified that at approximately 9:00 a.m. on May 14, 1987, she observed a black male walk out of the home of the victim, Cynthia Horton. The man was wearing a beige Kangol hat, sunglasses, a tweed jacket, and brown pants. Allen described the male's walk as "unusual, slow, and nonchalant." Thereafter, at the police station Allen identified a Kangol hat and a brown pair of pants as part of the wardrobe she saw the suspect wearing. However, Allen was unable to identify a photograph of defendant from the photo array. At trial, Allen suggested that she would be able to identify the defendant if she saw him walk. Over defense counsel's objections, the court ordered the defendant to walk across the courtroom. At this point a *voir dire* examination of Allen was conducted to determine whether she could identify the defendant from the exhibition of his walk. The court then determined that Allen would be prohibited from identifying the defendant based on his walk.

The victim, a black female, testified that at approximately 9:00 a.m. on May 14, 1987, the defendant beat on her front door and asked for "Paul." When the victim stated that the defendant had the wrong house, he forced the door open, threatened to "blow her brains out," acted as if he had a gun, and demanded money from her. The victim stated the defendant was wearing a beige hat, sunglasses, a multi-colored jacket, a beige shirt and brown pants. Once inside the house he removed his sunglasses, whereupon the victim observed that he had puffy eyes and a small vertical scar near his right eye.

The defendant ordered the victim to take off her clothes and to lie on her bed. He then took the victim's jewelry and "rambled" through her home.

The defendant returned to the victim's bedroom and stuck his tongue into her rectum and his lips into her vagina and had vaginal intercourse with her. The victim stated that she could see the defendant's face during the vaginal intercourse and that his eyes were open. Thereafter, the defendant went through other parts of the house, returned to the victim's bedroom where he had conversation with her and walked out of the house.

At trial, the victim identified the defendant from the witness stand as her attacker. Further, she also identified a scar near defendant's right eye as the same scar she had seen on her attacker.

In late June 1987, the victim observed the defendant walk up to the check-out counter of a nearby store where she worked. Apparently, the defendant did not recognize the victim because she was wearing different glasses and a different hairstyle. However, the victim recognized the defendant's voice. During conversation, she asked him to remove his glasses but he declined and left the store. A few days later, the defendant returned to the store whereupon the police were secretly called. When the police arrived, the victim observed the defendant attempt to run from them.

On July 1 or 2, 1987, the victim picked defendant's picture from a photo array. Further, the police had confiscated a beige Kangol hat and brown pants from the defendant and the victim identified these items as the clothes worn by her attacker.

Allan Zolin, the manager of a downtown hat company was the defendant's sole witness. Zolin testified as to the popularity of Kangol hats among black males. Zolin also testified that the hats came in fifteen to twenty different colors, types, styles, and materials.

On appeal defendant raises three assignments of error.

I

Defendant argues that he was denied his constitutional rights to equal protection and to a jury chosen from a fair cross-section of the community because the prosecutor used a peremptory challenge to exclude a black juror. Defendant argues that the prosecutor's peremptory challenge was a pretext for racial discrimination because (a) he did not give an adequate explanation as to why he executed his peremptory challenge, and (b) the juror excluded was the last remaining black juror. These arguments lack merit.

A defendant may establish a prima facie case of purposeful discrimination solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. *Batson v. Kentucky* (1986), 476 U.S. 79, 98, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69, 88, and paragraph three of the

syllabus. However, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the jury members of the defendant's race. *Id.* Finally, the defendant must show that such facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the juror on account of race. *Id.* Once the defendant makes a prima facie showing, the burden shifts to the state to come forward with a neutral explanation for challenging black jurors.[1] *Id.* The prosecutor may not rebut a prima facie showing by stating that he challenged the jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race or by affirming his good faith in individual selections. *Id.* Thus, just as the Equal Protection Clause forbids the states to exclude black persons from the jury on the assumption that blacks as a group are unqualified to serve as jurors, so it forbids the states to strike black jurors on the assumption that they will be biased in a particular case simply because the defendant is black. *Id.*

## A

■ Defendant argues that the prosecutor's explanation that his peremptory challenge was based on a "basic gut reaction" does not rebut the defendant's prima facie case of purposeful discrimination. This argument lacks merit.

We agree that a mere statement that "I have a basic gut reaction" by the prosecutor as an explanation for exercising peremptory challenge to strike a black juror would be insufficient to rebut a prima facie case of purposeful racial discrimination. See *United States v. Horsley* (C.A.11, 1989), 864 F.2d 1543 ("I just got a feeling about him."); *People v. Turner* (1986), 42 Cal.3d 711, 230 Cal.Rptr. 656, 662, 726 P.2d 102, 108 ("I don't think I have to give the court any reasons at this time."). However, the record reveals that the prosecutor's explanation was much more than an "assumption or intuitive judgment." See *Batson, supra,* 476 U.S. at 96–99, 106 S.Ct. at 1723–1724, 90 L.Ed.2d at 87–90. The prosecutor explained,

"I excused her for the simple reason that I go with basic gut instincts, and she was a little giddy up there * * * during my questioning she was giddy * * * silly. I felt a sense of silliness about her in response to my questions.

---

1. The *Batson* court emphasized that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. *Batson, supra,* 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87.

"I recall asking her a question, if I prove—produce evidence which convinces you beyond a reasonable doubt of his guilt, could you return a verdict—would you hesitate at all in returning a verdict of guilty.

"I think that was a pretty straightforward question, and she hesitated. And I think at this point in time she began becoming a little giddy with me, and it caused me a feeling—I was very uncomfortable with her. * * * I exercised that peremptory because of my gut feeling that she would have guilt fulfilling her role as a juror in a very difficult decision making process.

"And I asked her a question, and she hesitated in answering the question. And in other questions she acted a little silly up here. * * * "

We hold that the prosecutor articulated a neutral explanation for his challenge.[2] See *State v. Williams* (June 8, 1989), Cuyahoga App. No. 55490, unreported, at 15, 1989 WL 62225.

## B

■ Defendant argues that purposeful discrimination was established when the prosecutor exercised a peremptory challenge regarding the last black prospective ·juror. Defendant attempts to persuade this court to follow *Haynes v. State* (1987), 103 Nev. 309, 739 P.2d 497; *Garrett v. Morris* (C.A.8, 1987), 815 F.2d 509; *State v. Mims* (La.1987), 505 So.2d 747; *United States v. Chalan* (C.A.10, 1987), 812 F.2d 1302; *Commonwealth v. McCormick* (1986), 359 Pa.Super. 461, 519 A.2d 442. However, defendant's reliance on the above cases is misplaced because each case involved situations where all peremptory challenges regarding prospective jurors of the defendant's race were exercised only by the court or the prosecutor. In the instant case, there were two black prospective jurors. The first black juror was removed at defendant's request. Thus, the prosecutor was not responsible for the removal of all prospective black jurors from the jury.

Defendant fails to satisfy the third and most important element of *Batson*. The record is devoid of facts and circumstances raising an inference that the

---

**2.** Defendant's attempt to persuade this court to follow *Turner* is misplaced. *Turner* involved a situation where the prosecutor's explanation for his exercise of peremptory challenge to exclude a prospective black juror from jury trying black murder defendant, whose victims were white, that prospective juror had difficulty understanding questions, was not sufficient to sustain burden of showing non-discriminatory motive where unchallenged, white jurors were also confused by questions.

In the instant case both the defendant and the victim are black. Further, the record does not show that any other juror who was acting giddy, silly, or having trouble answering questions was retained.

prosecutor's choice was based on the race of the excluded juror. See *Williams, supra.*

Accordingly, the first assigned error is overruled.

## II

■ Defendant argues that the court violated his Fifth and Fourteenth Amendment rights when it required him to walk in the presence of the jury wearing the confiscated Kangol hat in order to assist a witness in arriving at an in-court identification. The appellant supports his argument with the decision of *State v. Naylor* (1980), 70 Ohio App.2d 233, 24 O.O.3d 306, 436 N.E.2d 539. In that case, the defendant was required to speak certain words during trial and in the presence of the jury for the purpose of allowing the victim to identify him. *State v. Kidd* (Mar. 29, 1984), Cuyahoga App. No. 47281, unreported, at 5, 1984 WL 5023. Defendant's reliance on *Naylor* is misplaced.

The Fifth Amendment privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature * * * " *Schmerber v. California* (1966), 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908, 914. In *State v. Pykare* (June 9, 1983), Cuyahoga App. No. 44652, unreported, at 10, 1983 WL 3080, this court held that it was not a violation of the defendant's Fifth Amendment rights to compel items seized from defendant to be used as evidence against the defendant. We have also held that the defendant's right against self-incrimination was not violated when his fingerprints were taken in the presence of the jury. *State v. Ashford* (Dec. 11, 1986) Cuyahoga App. No. 51366, unreported, at 13, 1986 WL 14499; *State v. Johnson* (June 30, 1983), Cuyahoga App. No. 45861, unreported, at 1, 1983 WL 5528.

We hold that the defendant's constitutional rights were not violated when he was required to walk across the court room wearing the confiscated hat. Such acts were not testimonial or of a communicative nature.

■ Defendant argues that he was prejudiced when the court refused to let Allen testify following her *voir dire* examination that the defendant did not walk in the same manner as the attacker had walked the day of the incident. Defendant argues that such testimony was exculpatory in nature. This argument lacks merit because Allen also testified during *voir dire* that she thought the defendant had faked his walk for the jury. Thus, the defendant was not prejudiced.

Accordingly, the second assigned error is overruled.

## III

In his third assigned error, defendant argues that the court erred by admitting the victim's hospital records into evidence because the records did not fit a hearsay exception. Defendant complains that the records contained hearsay statements regarding the victim's allegations that "she was vaginally raped by a male intruder at 9:00 a.m. and that the intruder threatened her with a gun." This argument lacks merit.

Statements made for the purpose of medical diagnosis or treatment are hearsay exceptions pursuant to Evid.R. 803(4) which reads as follows:

"Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

Surely, the statement that "the victim was vaginally raped by a male intruder at 9:00 a.m." is pertinent to an accurate diagnosis and, therefore, admissible. See Staff Notes to Evid.R. 803(4); *McQueen v. Goldey* (1984), 20 Ohio App.3d 41, 44, 20 OBR 44, 46, 484 N.E.2d 712, 716. The admission of the statement that "the intruder threatened her with a gun" constituted error because it does not qualify as an exception to the hearsay rule under Evid.R. 803(4). See *Goldey, supra.*

However, the record readily demonstrates that the alleged error was harmless error and, therefore, it was not prejudicial. Crim.R. 52(A). The hospital record also states that the victim "didn't see the gun." Moreover, the victim testified on both direct and cross-examination that she never saw the alleged gun.

Accordingly, the third assigned error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

JOHN V. CORRIGAN and MATIA, JJ., concur.