OPINION
Pursuant to this court's granting his motion for delayed appeal, defendant-appellant, Kenneth D. Rowland, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of rape in violation of former R.C. 2907.02, and one count of kidnapping in violation of R.C. 2905.01. Because the record fails to demonstrate plain error, and because defendant's convictions are supported by the manifest weight of the evidence, we affirm.
Pursuant to an indictment filed July 19, 2001, defendant was charged with one count of kidnapping, one count of attempted rape, and three counts of rape, including one count of digital penetration, one count of vaginal intercourse, and one count of anal intercourse. On July 23, 2001, defendant entered a plea of not guilty and, on September 4, 2001, a jury trial began. At the conclusion of the state's evidence, the trial court, pursuant to defendant's Crim.R. 29 motion, dismissed the second count of the indictment charging defendant with attempted rape. Following deliberations, the jury rendered a verdict of guilty on the counts charging kidnapping and vaginal intercourse, but not guilty on the counts charging digital penetration and anal intercourse.
The trial court scheduled sentencing for November 1, 2001, and also scheduled a sexual predator hearing for the same date. Although the trial court determined defendant was not a sexual predator or habitual sex offender, the court found defendant to be a sexually oriented offender. The trial court sentenced defendant to a five-year determinate term of incarceration on each of the two counts for which defendant was found guilty, and ordered that they be served concurrently. Defendant appeals, assigning two errors:
"ASSIGNMENT OF ERROR #1:
"THE COURT SUB JUDICE ABUSED ITS DISCRETION IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS AND RIGHT TO A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS AND ARTICLE 1, § 10 OF THE OHIO CONSTITUTION WHEN IT ADMITTED HEARSAY STATEMENTS OF MS. BYRD DURING THE TESTIMONY OF MS. LOFTUS AS SAID STATEMENTS WERE NOT ADMISSIBLE UNDER O.EVID.R. 803(4).
"ASSIGNMENT OF ERROR #2:
"THE COURT SUB JUDICE COMMITTED PREJUDICIAL ERROR IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHT AND RIGHT TO A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS AND ARTICLE 1, § 10 OF THE OHIO CONSTITUTION WHEN IT ENTERED INTO THE RECORD THE JURY'S VERDICTS FINDING APPELLANT GUILTY OF RAPE AND KIDNAPPING AS SAID VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
On July 9, 2001, the police were dispatched on a sexual assault call to 2825 Citizens Place, Apartment A, where they found defendant standing outside the apartment. Because defendant matched the dispatcher's description, the police detained defendant at the apartment. The police talked to the victim and ultimately called the sexual assault squad. Pursuant to the squad's instructions, the victim was transported to Grant Hospital for an examination; defendant was transported to police headquarters.
According to the victim's testimony, in March 2001, defendant helped her move into an apartment. By late March or early April, their relationship had matured beyond friendship to a "boyfriend/girlfriend" relationship. (Tr. 178.) In April 2001, defendant moved into the apartment with the victim and her three minor children.
While the cohabitation was agreeable to both at first, defendant then began drinking "more constantly." (Tr. 179.) The victim asked defendant to stop drinking, but he did not. Around June 2001, she asked defendant to leave. Defendant became angry, and he did not move. She continued to attempt to persuade defendant to move out of the apartment and, by July 8, 2001, the relationship was over. Their voluntary sexual relationship had ended 45 days earlier at her determination.
On July 8, 2001, defendant came home and was upset. He entered the kitchen, and began slamming items. The victim's three-year-old son walked into the kitchen and defendant jerked the child's arm. When the victim told defendant to keep his hands off her children, he began "hollering and cussing" at her. (Tr. 183.) She in turn called 9-1-1; defendant snatched the telephone out of her hand and yanked it out of the wall. Defendant was angry, claiming the victim had spit on him.
The police came to the apartment and separated defendant and the victim. After the medics and the police came, defendant gathered a couple of items and left. The police and medics then also left.
Defendant returned later that night, and was still upset. He entered the bedroom, where the victim was lying on the bed, and attempted to irritate her. She gathered things so she could sleep on the sofa, and defendant announced he was going to have sexual intercourse with her. She said no, and attempted to walk out of the bedroom. Defendant slammed the door and told her to take her clothes off. When she refused, defendant ripped off her nightshirt and twisted it around her stomach. She was also wearing shorts and underwear, and defendant tore those from her body. She kept asking him to let her go and to stop, but defendant threw her on the bed and bit her breast.
According to the victim's testimony, defendant then "got up on top of me and he put his legs on each of my inner of my arms to hold me down, and he said that I was going to suck his dick." (Tr. 191.) The victim refused and defendant stated he was "going to eat my pussy." Id. Because of her resistance, defendant stopped. Before releasing the victim's hands, however, defendant grabbed a rosary that the victim wore around her neck and started choking her until she began to pass out. At that point, defendant performed vaginal intercourse on the victim. Defendant turned her over, and performed anal intercourse. Defendant also digitally penetrated her several times.
In an effort to escape, the victim told defendant she needed to go to the bathroom. Defendant pulled her by her hair and nightshirt into the bathroom. When she did not use the facilities, defendant began pulling the victim's hair and hitting her head against the wall. She stated she needed a glass of water, so defendant pulled her by her hair to the kitchen. She did not drink, and the glass fell to the floor. The victim slipped on the water, and defendant pulled her up by her hair.
Defendant dragged her back to the bedroom and told her he was going to have to kill her. Defendant began packing a bag and, while he leaned over, the victim grabbed some clothes and ran upstairs to a neighbor's apartment. She called the police, who responded by detaining, and ultimately transporting, defendant to police headquarters.
By contrast, defendant testified that he moved in with the victim at 247½ Hamilton Avenue. Defendant moved out when the victim stopped taking some medications, causing her to become vindictive. Grieving his mother's death at the time, defendant became dependent on alcohol. As a result, he and the victim became more distant, but he nonetheless helped pay some bills and hoped to marry her.
In late February, defendant helped the victim move into 2825 Citizens Place. He ultimately moved in to help her because of her heart problem. She became pregnant, and they discussed marriage in August.
The doctor took the victim off medications due to the pregnancy, and the victim became "real nasty." (Tr. 248.) Defendant stayed to help with the children, even though the victim asked him to go. By June 10, defendant told her he would start saving his own money, and he began to look for an apartment. Because his efforts to save money caused him to stop giving the victim money, she became upset with him.
On July 8, defendant returned home and asked if the victim had prepared anything for him to eat. When she said no, defendant said he was going to cook something. She told defendant he could not eat there and that she wanted him out. She pushed him, he pushed her, and she pushed him again. Defendant grabbed the victim, again pushed her and chased her to the sofa. She fell over it, got up, and called the police. Defendant then grabbed her, she hit his face with the telephone, and he pulled her down; as he did, his nail pricked her finger. She responded by spitting on him. Both of them were angry at that point. Defendant said he was going to call the police, but the victim phoned first. The police came, and defendant told them he did not want to press charges for her having hit him with the telephone. The police gave the victim some information about domestic violence and left. Defendant then gathered his money and went to a friend's house.
Between 10:30 and 11:00 p.m., defendant returned to the home. Defendant went to the bedroom, where he found the victim on the telephone. He sat on the bed, removed his shoes, his shirt, his pants, and lay on the bed. Defendant told the victim he wanted to talk to her. She was still on the telephone, so he lay there, waiting. He said they needed to talk, but she told him to just go. They communicated further, and defendant kissed the prick on her finger he had caused earlier in the day. That led to further kissing and ultimately to consensual sex, after which defendant dozed off. He awakened to rattling in the closet, where the victim was getting clothes. When defendant asked where she was going, she said "I told you no." (Tr. 256.) When he inquired, she reiterated that she had told him no, and ran for the front door. Defendant saw her run up the stairs; he went back to get his shirt, and went upstairs to knock on the door. Defendant heard the victim screaming inside. He went back downstairs, and called the police to tell them the victim was calling to say defendant raped her. The police arrived at the apartment and took defendant to headquarters.
Defendant's first assignment of error asserts the trial court erred in admitting the hearsay testimony of Nurse Colleen Loftus. While defendant acknowledges that Evid.R. 803(4) permits hearsay statements made for purposes of medical diagnosis or treatment, defendant contends Loftus' testimony went beyond the bounds of Evid.R. 803(4).
Evid.R. 803(4) provides:
"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
"* * *
"(4) Statements for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The rationale underlying Evid.R. 803(4) is that a patient has a strong incentive to tell the truth when describing his or her condition to a doctor who "could wield a sharp scalpel." State v. Clary (1991),73 Ohio App.3d 42, 52, dismissed, jurisdictional motion overruled,62 Ohio St.3d 1405, citing Meaney v. United States (C.A.2, 1940),112 F.2d 538. Nonetheless, the "exception is founded on reasonableness and it should not serve as a conduit through which matters of no medical significance are admitted." Id. Accordingly, a victim's statement that his or her life was threatened generally is not admissible under Evid.R. 803(4). Id. Hospital records that reflect a victim's statement that she was vaginally raped by a male intruder is pertinent to accurate diagnosis and is admissible under the hearsay exception embodied in Evid.R. 803(4); however, the statement that she was threatened with a gun, is not admissible under that exception. State v. Hairston (1990),67 Ohio App.3d 341.
Here, with Loftus on the stand, the prosecution asked about the nurse's approach to rape victims. In responding, the nurse explained that she sought basic information, including a history. The prosecution inquired what type of history, and the nurse explained that she asked the victim to tell what happened. The prosecution then asked what the victim in this case told Loftus. Defendant objected, stating "[t]hat would be hearsay. We are going to hear [the victim's] version very shortly anyway." (Tr. 155.) The prosecution noted that the purpose was for medical treatment, rendering the evidence admissible. The trial court instructed the jury as follows:
"The nurse had to do certain things. She does it on the basis of what the person tells her to do. I'm sure she is going to testify — maybe she took some samples, I don't know. Obviously, she is here as a witness, because she did certain things with the alleged victim. I guess you have to hear what the victim — alleged victim told her so that you know why she did what she did.
"However, I instruct you very strongly that what she says is not for the truth of the matter. I'm not going to allow it for the truth, only that this person told her these things; and, therefore, she did whatever she had to do as a nurse as a result of what she was told. So it's only for that purpose, okay. It's not for the purpose of what she told her was the truth or wasn't the truth. * * *" (Emphasis added.) Id.
Thereafter, the prosecution asked what the victim told Loftus. Loftus stated:
"* * * She told me that during that night, that apparently they got into an argument. She explained that he was calling her names. He was pulling her around. At one point, he pinned her with his knees on her arms, pulled her around the apartment by her hair, banging her head on the wall and bed, had sexual intercourse with her, twisted her nightshirt around her. One, quote, `He was twisting my nightshirt around me saying he would kill me and the baby at the same time.' " (Tr. 156.)
Some of the nurse's testimony was admissible under Evid.R. 803(4); some was not. For example, the statement that defendant had sexual intercourse with the victim was admissible; the statement that defendant was calling her names was not. Nonetheless, the trial court in effect sustained defendant's objection and permitted none of the testimony to be admitted for its truth under Evid.R. 803(4) as an exception to the hearsay rule. Instead, the trial court instructed the jury that none of the nurse's testimony concerning the victim's statements to the nurse would be admitted for its truth, but simply to explain why the nurse examined the victim as she did. Although the nurse's testimony arguably goes beyond the bounds of explaining solely the reasons for her procedure, defendant did not object to the testimony as exceeding the basis for which the trial court allowed it. Accordingly, we examine the matter under a plain error standard.
Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In State v. Barnes (2002), 94 Ohio St.3d 21,27, the Ohio Supreme Court recently noted that "[b]y its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain. To be `plain' within the meaning of Crim.R. 52(B), an error must be an `obvious' defect in the trial proceedings. * * * Third, the error must have affected `substantial rights.' We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." (Citations omitted.) "Even if a forfeited error satisfies these three prongs, however, Crim.R. 52(B) does not demand that an appellate court correct it. Crim.R. 52(B) states only that a reviewing court `may' notice plain forfeited errors; a court is not obliged to correct them. We have acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error `with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " Id., quoting State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus.
Here, even if the trial court erred in allowing Loftus to testify to the extent noted concerning the victim's statements to her, we are unable to conclude that the outcome of the trial would have been different absent the nurse's testimony. Because the victim testified, Loftus' testimony, given in the context of the trial court's pointed instruction, at best shows the victim was able to maintain the same story to the jury that she offered to Loftus at the hospital. Accordingly, defendant's first assignment of error is overruled.
Defendant's second assignment of error asserts the judgment of the trial court is not supported by the manifest weight of the evidence. When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997),78 Ohio St.3d 380, 387 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"); State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
R.C. 2905.01 defines kidnapping, and states:
"(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
"* * *
"(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]" Former R.C.2907.02 defines rape, and states:
"(A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
Here, the victim's testimony satisfies all of the elements of the two offenses. Specifically, the victim testified defendant restrained her by holding her down, and against her instructions to stop, he vaginally raped her. While defendant testified to the contrary, the discrepancy in the testimony is a matter for the jury to resolve. DeHass, supra. Moreover, the physical evidence supported the victim's testimony in that she presented to the hospital with bruises to her arms; defendant had scratches on his back. The physical evidence thus was consistent with the victim's version of the incident and inconsistent with defendant's. While defendant suggests that the scratches he sustained may have been caused by the earlier altercation between defendant and the victim, that, too, is a matter for the jury to resolve. Given the evidence, we cannot say the jury lost its way in resolving the divergent testimony presented. Defendant's second assignment of error is overruled.
Having overruled defendant's two assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
DESHLER and PETREE, JJ., concur.