WINDOM, Judge.
Andrew Reid Lackey appeals his two capital-murder convictions and sentences of death. Lackey was convicted of one count of capital murder for taking the life of Charles Newman during the course of a *237 robbery, see § 13A-5-40(a)(2), Ala.Code 1975, and a second count of capital murder for taking the life of Charles Newman during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975. The jury unanimously recommended that Lackey be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Lackey to death.
On appeal, Lackey asks this Court to remand the cause to the circuit court with instructions for it to hold a hearing pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[1] Specifically, Lackey argues that the record raises an inference that the State used its peremptory challenges in a racially discriminatory manner. The State notes that Lackey did not raise a Batson objection at trial and denies that it violated Batson. The State then asserts that “the [African-American] veniremembers struck by the State shared attributes that led ... the State to strike them.” (State’s brief, at 34-35.) However, due to the lack of a Batson objection and resulting hearing, the State submits, “these attributes do not appear in the record[; therefore,] the State has no objection to a remand for the ... purpose of holding a hearing on the Batson issue.... ” (State’s brief, at 35.) Specifically, the State seeks an opportunity “to offer its reasons for striking [the African-American] veniremembers.” (State’s brief, at 35.)
This Court has explained:
“In Batson the United States Supreme Court held that black veniremembers could not be struck from a black defendant’s jury because of their race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in Batson to apply also to white defendants.... The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of Batson were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of Batson apply to the striking of white prospective jurors. White Consolidated Industries, Inc. v. American Liberty Insurance, Co., 617 So.2d 657 (Ala.1993).”
Grimsley v. State, 678 So.2d 1194, 1195 (Ala.Crim.App.1995).
Although Lackey did not raise a Batson objection at trial, this failure does not preclude this Court’s review. See Rule 45A, Ala. R.App. P.
“Under the ‘plain error’ doctrine, as enunciated in Rule 45A, [Ala. R.App. P.,] the Court of Criminal Appeals is required to search the record in a death penalty case and notice any error (ruling or omission) of the trial court, and to take appropriate action, whenever such error has or probably has adversely affected the substantial right of the [defendant], in the same manner as if defendant’s counsel had preserved and raised such error for appellate review.”
Ex parte Johnson, 507 So.2d 1351, 1356 (Ala.1986) (citations and quotations omitted). “For plain error to exist in the Batson context, the record must raise an inference that the State engaged in ‘purposeful discrimination’ in the exercise of its peremptory challenges.” Lewis v. State, 24 So.3d 480, 489 (Ala.Crim.App.2006) (citing Ex parte Watkins, 509 So.2d 1074 (Ala.1987)).
The Alabama Supreme Court has explained:
*238 “The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.’ [People v.] Wheeler, 22 Cal.3d [258,] at 280, 583 P.2d [748,] at 764, 148 Cal.Rptr. [890,] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
“2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
“3. The past conduct of the offending attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
“4. The type and manner of the offending attorney’s questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, -583 P.2d at 764, 148 CaLRptr. at 905.
“5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal. Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 [905] (1978).
“6. Disparate treatment of members of the jury venire with the same characteristics; or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
“7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
“8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229,] 242, 96 S.Ct. [2040,] 2049 [, 48 L.Ed.2d 597 (1976) ].
“9. The offending party used peremptory challenges to dismiss all or most black jurors, but did not use all of his peremptory challenges. See Slappy, 503 So.2d at 354, Turner, supra.”
Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987).
Here, both Lackey and the State ask this Court to remand this cause to the circuit court to provide the State with an opportunity to explain its reasons for striking African-American veniremembers. This Court’s “review of the record indicates that, if the defense had filed a Bat-son motion at trial raising the arguments he now raises, the trial court would have been obligated to require the prosecution to state the reasons for each of its peremp *239 tory challenges.” Whatley v. State, [Ms. CR-08-0696, Oct. 01, 2010] — So.3d-, -(Ala.Crim.App.2010). Because Lackey did not raise a Batson objection at trial, the State did not have an opportunity to respond to his allegations or to provide its reasons for striking African-American veniremembers. Further, the circuit court is in a better position to evaluate the parties’ arguments and to rule on the propriety of the State’s reasons for striking African-Americans because it was present during the jury-selection proceedings.
Thus, in accordance with the parties’ request, this Court remands this cause to the circuit court for that court to hold a hearing during which it is to require the State to provide its reasons for striking African-American veniremembers and to provide Lackey with an opportunity to “offer evidence showing that the [State’s] reasons or explanations are merely a sham or pretext.” Preachers v. State, 963 So.2d 161, 166 (Ala.Crim.App.2006) (citations and quotations omitted). See also Batson, 476 U.S. at 97. The circuit court shall make a determination regarding whether the State has provided legitimate race-neutral reasons for striking African-American venire-members. If the State cannot provide legitimate race-neutral reasons for the use of its peremptory challenges against African-American veniremembers or if Lackey establishes that the State’s reasons are a sham or pretext, Lackey shall be entitled to a new trial. See, e.g., Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006). If, on the other hand, the State provides legitimate race-neutral reasons for using it peremptory challenges against African-Americans, Lackey shall not be entitled to a new trial. In either event, the circuit court shall make written findings of fact.
Further, the circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 90 days after the release of this opinion. The return to remand shall include a transcript of the Batson hearing and the circuit court’s written findings of fact.
REMANDED WITH INSTRUCTIONS.
WISE, P.J., and WELCH, KELLUM, and MAIN, JJ., concur.

On Return to Second Remand 

WINDOM, Presiding Judge.
Andrew Reid Lackey appeals his two capital-murder convictions and sentences of death. Lackey was convicted of one count of capital murder for the murder of Charles Newman during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975, and a second count of capital murder for the murder of Charles Newman during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975.
Lackey’s appeal is before this Court in an unusual procedural posture that must be explained before this Court turns to the merits of his appeal. Lackey’s trial began on February 25, 2008, after which the jury found him guilty of two counts of capital murder. On March 3, 2008, the circuit court conducted the penalty phase of the trial, after which the jury unanimously recommended that Lackey be sentenced to death. On March 26, 2008, the circuit court conducted a judicial-sentencing hearing and sentenced Lackey to death. On April 29, 2008, appellate counsel was appointed to represent Lackey on appeal.
Shortly after appellate counsel was appointed, Lackey informed his new attorney *240 that he did not want to appeal his convictions and sentences of death.[1] According to Lackey, appellate counsel refused to listen to or to comply with his wishes, and, on February 3, 2009, counsel filed a brief challenging Lackey’s convictions and sentences. In the brief, counsel argued, among other things, that the record raises an inference that the State used its peremptory challenges in a racially discriminatory manner; therefore, this Court should remand the cause to the circuit court with instructions for that court to hold a hearing pursuant Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). On April 16, 2009, the State filed a brief in which it agreed to a remand for a Batson hearing. On October 28, 2010, Lackey, apparently frustrated with appellate counsel’s refusal to comply with his desire not to pursue an appeal, wrote the Alabama Attorney General. In his letter, Lackey told then Attorney General Troy King that he “wish[ed] to drop [his] appeal and to not continue to appeal [his] death penalty conviction.” (Letter to Troy King attached as an exhibit to the State’s motion for a timely ruling.) Lackey’s letter goes on to state:
“I, Andrew Reid Lackey, ... do not wish to appeal my death penalty conviction beyond the so-called ‘automatic’ level.
“I have already written both Kristen Nelson of [Equal Justice Initiative] and my original [appellate] attorney, James Barry Abston of Huntsville, ... several months ago. ... I am neither crazy nor suicidal nor mentally unstable; I simply wish not to continue to appeal my death penalty conviction.
[[Image here]]
“I, Andrew Reid Lackey, willfully and knowingly declare my intentions to cease and desist my appeals over my death penalty conviction. I declare my intentions to entirely drop my criminal case appeals, fully aware [that the attorney general’s office] will seek an execution date, which I do not and will not protest.”

Id.

On November 5, 2010, this Court, unaware of Lackey’s desire to receive only plain-error review, and, in accordance with the appellate counsel’s and the attorney general’s requests, remanded the cause to the circuit court with instructions for it to hold a Batson hearing. The circuit court complied and, on December 13, 2010, the return to remand was filed with this Court.
After appellate counsel and the attorney general’s office fully briefed the Batson issue on return to remand, Lackey turned to this Court for help effectuating his desire not to pursue his briefs on appeal and to receive only plain error review. Specifically, on April 11, 2012, Lackey sent this Court a letter stating:
“Hello. My name is Andrew Lackey. I wish to drop my Batson issue and not appeal my death sentence. Please get in touch with me.”
(April 11, 2012, Letter from Lackey.) Thereafter, on June 8, 2012, Lackey filed a motion with this Court seeking to invoke his state-law right to represent himself on appeal and to “withdraw all briefs filed on [his] behalf and to withdraw any other documentation and arguments presented by [appellate] counsel.... ” (June 8, 2012, motion.) In his motion, Lackey explained *241 that he “does not wish for his sentence to be changed nor for his conviction to be reversed or remanded.” Id. He goes on to state that he “understands the law of Alabama regarding automatic review of death penalty cases and asks that th[is] [C]ourt review only as strictly required under law, i.e., for plain error.” Id. Along with his motion, Lackey attached a copy of a letter he sent appellate counsel that stated:
“Dear Equal Justice Initiative and Mr. Abston:
“I thank you for you work on my behalf, but your efforts do not match my desires in this matter.
“I have tried to make my wishes clear in the past. I do not desire your services any further and your representation is hereby terminated.
Do not file anything further on my behalf.”
(Attachment to June 8, 2012, motion.)
On June 28, 2012, this Court remanded this cause to the circuit court with instructions for it to conduct a hearing during which the circuit court was to apprise Lackey of the dangers and disadvantages of waiving his right to appellate counsel, of invoking his state-law right to represent himself, and of striking the briefs that had been filed on his behalf. Before the hearing, Lackey hired new counsel (hereinafter “new counsel”) to aid him in having appellate counsel removed as his attorneys.
In accordance with this Court’s order remanding the cause, the circuit court scheduled a hearing for July 16, 2012. On July 12, 2012, appellate counsel, whose services Lackey sought to terminate, filed a motion in the circuit court seeking a continuance and a motion seeking a mental-competency evaluation by a mental-health expert. The circuit court denied appellate counsel’s motion for a continuance, and on July 16, 2012, the circuit court conducted a hearing in compliance with this Court’s instructions.
At the hearing, appellate counsel, in an attempt to remain counsel against Lackey’s wishes, argued that Lackey was incompetent to decide whether to represent himself and whether to strike all documents filed on his behalf in this Court. Lackey, through new counsel, challenged appellate counsel’s assertion that Lackey was incompetent to represent himself. Lackey also argued that he knowingly and voluntarily waives his right to counsel, invokes his right to represent himself, and exercises his right to strike all documents and briefs filed on his behalf. In accordance with this Court’s order remanding the cause, the circuit court apprised Lackey to the dangers and disadvantages of Lackey’s decision to represent himself and strike all briefs filed on his behalf. Lackey testified that he knows those dangers and has voluntarily made his decision.
After the hearing, the circuit court issued a detailed order denying appellate counsel’s motion for a mental evaluation and finding that Lackey is competent to exercise his right to represent himself. The circuit court further found that:
“Lackey’s motion to proceed pro se and to strike all briefs filed on his behalf is made knowingly, intelligently, voluntarily, and with full knowledge and appreciation of the dangers and potential pitfalls associated with such a decision.”
(R. on return to remand 14.) The circuit court then granted Lackey’s motion to terminate appellate counsel’s employment, to proceed pro se, and to strike all documents filed on his behalf.
On July 16, 2012, the return to remand was filed with this Court. Because Lackey was granted permission to represent himself on appeal and to strike all documents that have been filed on his behalf, this *242 Court must first review whether the circuit court correctly determined that Lackey competently, knowingly, and voluntarily made those decisions. If this Court determines that the circuit court was correct, it must then review the sufficiency of the evidence to sustain Lackey’s convictions and sentences, search the record for plain error, and review the propriety of his sentences of death. §§ 12-22-150, 13A-5-53, and 13A-5-55, Ala.Code 1975; Rule 45A, Ala. R.App. P. See also Sibley v. State, 775 So.2d 235, 240 (Ala.Crim.App.1996); Block v. State, 744 So.2d 404, 406 (Ala.Crim.App.1996).
I.
Under Alabama law, Lackey has the right to waive counsel on appeal and to represent himself. See Ex parte Scudder, 789 So.2d 837, 841 (Ala.2001) (“We conclude that, taken together, §§ 12-22-130 and 15 — 12—22(b)[, Ala.Code 1975,] confer upon a defendant in a criminal case the right to represent himself on appeal if he desires to do so.”); Johnson v. State, 40 So.3d 753, 756 (Ala.Crim.App.2009) (inmates under a sentence of death have a right to represent themselves on appeal). Lackey also has the right to have appellate counsel’s briefs stricken. See Clemons v. State, 814 So.2d 317, 318 (Ala.Crim.App.2001) (retracting a previous order requiring counsel on appeal, striking counsel’s brief, and allowing Clemons to proceed pro se); McKaskle v. Wiggins, 465 U.S. 168, 174, 178, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (“[a] defendant’s right to self-representation plainly encompasses [an inmate’s right] to control ... his own defense, [and] [i]f ... counsel’s participation over the defendant’s objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, [the right to self-representation] is eroded.”). To make those decisions, however, Lackey must be legally competent, and the decision must have been made knowingly and voluntarily. See Godinez v. Moran, 509 U.S. 389, 391, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (holding that a defendant must be competent to waive counsel); Johnson, 40 So.3d at 756-57 (holding that a death row inmate’s decision to represent himself on appeal must be knowing and voluntary); Sibley, 775 So.2d at 240; Block, 744 So.2d at 406.
A.
First, this Court must determine whether the circuit court abused its discretion in finding Lackey competent to waive counsel, to proceed pro se, and to strike all documents filed on his behalf. Hodges v. State, 926 So.2d 1060, 1069 (Ala.Crim.App.2005) (noting that a circuit court’s determination that a person is competent to stand trial is reviewed for an abuse of discretion).
The competency standard to waive counsel and to represent oneself is the same as “the competency standard for standing trial.” Godinez, 509 U.S. at 391. Thus, a person satisfies the competency standard to waive counsel and to represent himself if “he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and ... he has a rational as well as factual understanding of the proceedings against him.” Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). See also Rule 11.1, Ala. R.Crim. P. (“A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understand *243 ing of the facts and the legal proceedings against the defendant.”). However, “[a] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense [is not com-. petent to waive counsel and represent himself].” Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).
Thus, an individual may represent himself on appeal and withdraw all documents filed on his behalf only if that person has the “capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.” Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966). The test to determine a person’s “capacity to appreciate his position and make a rational choice,” id., involves a determination of the following:
“ ‘(1) whether that person suffers from a mental disease, disorder, or defect; (2) whether a mental disease, disorder, or defect prevents that person from understanding his legal position and the options available to him; and (3) whether a mental disease, disorder, or defect prevents that person from making a rational choice among his options.’ ”
Hauser ex rel. Crawford v. Moore, 223 F.3d 1316, 1322 (11th Cir.2000) (quoting Lonchar v. Zant, 978 F.2d 637, 641-42 (11th Cir.1992)).
Before trial, defense counsel had Lackey evaluated by Frankie L. Preston, a licensed clinical psychologist, to determine whether Lackey suffered from a mental disorder at the time of the offense and to determine whether Lackey was competent to participate in his defense and to stand trial. (C. 336.) Dr. Preston described Lackey as “socially awkward, probably shy and anxious in unfamiliar surroundings, but sufficiently confident in his abilities to communicate verbally and in writing, to strategize, and financially achieve beyond most others his age.” (C. 337.) After interviewing Lackey multiple times and having Lackey perform multiple tests and questionnaires, Dr. Preston reported that Lackey has an IQ score of 84. He stated that Lackey was angry, depressed, anxious, and uncertain about his future and suffered from low morale. According to Dr. Preston, Lackey was highly introverted and uneasy in close interpersonal involvements. Dr. Preston explained that Lackey was emotionally detached and had long endured suicidal preoccupations. Dr. Preston did not, however, state that Lackey suffered from any serious mental disease or disorder.
In relation to Lackey’s competency to stand trial, Dr. Preston administered the MacArthur Competence Assessment Tool. The results of the MacArthur Competence Assessment Tool indicated that:
“[Lackey] appears to have an adequate understanding of the legal process and charges. Likewise, he should be able to consult with his attorney in a reasonable way. He has the capacity to seek, identify, weigh, and balance more relevant and less relevant information, as well as to use this data to make decisions about his own case.”
(C. 341.) Dr. Preston explained his own clinical diagnostic impressions as follows:
“Within a reasonable degree of evaluative certainty, [and] based on history (personal and collateral), interviewing, and testing, Mr. Lackey was not suffering from nor experiencing a mental disorder which would compromise his consciousness, mood, or thoughts as to being able to morally distinguish right *244 from wrong or distinguish and understand ‘legal’ from ‘illegal’ behavior. He is able to understand the legal charges he faces; participate in his defense; conduct himself properly during Court proceedings; and appreciate the range of possible sentencing outcomes.”
(C. 342.) (Footnote omitted.) At trial, Dr. Preston testified that his examination of Lackey indicated that Lackey is an introvert who lacks confidence in social situations and becomes anxious around other people. According to Dr. Preston, Lackey “has experienced repeated episodes of persistent depressed mood and sleep disturbance accompanied by a significant weight change and social withdrawal.” (R. 1166.) At other times, Lackey “experienced repeated episodes of persistent elated mood or increased mood, increased energy level, racing thoughts and uncontrollable talkativeness accompanied by heavy spending and inflated self confidence.” Id. Lackey, however, had no experience with “thought broadcasting, thought insertion, thought withdrawal, auditory distortions or hallucinations, grandiose beliefs, persecutory beliefs or feelings of being uncontrolled.” Id. While in jail awaiting trial, Lackey thought that other people were spying on him and talking about him. Dr. Preston explained that those thoughts are “not an uncommon response for someone that’s in jail because they typically are watching you.” (R. 1167.) Dr. Preston testified that Lackey indicated that he had special powers, but it was later discovered that Lackey was referring to his skills in computer games.
Dr. Preston stated that Lackey has suffered from generalized anxiety disorder and social phobia for a large portion of his life. Dr. Preston “concluded that [Lackey] was experiencing some depression, anxiety, hopelessness!, and] pessimism about his legal situation.” (R. 1170.) Dr. Preston, however, testified that Lackey did not suffer from any severe mental disorder and concluded that Lackey was sane at the time of the offense and was competent to stand trial and to aid in his defense.[2]
At the hearing on Lackey’s decision to represent himself on appeal and to strike the documents previously filed on his behalf, new counsel explained that he had met with Lackey and that he and Lackey were prepared to establish that Lackey is competent and that “he knowingly and voluntarily waives his right to appellate counsel, terminates their services and strikes the briefs and requests the Court to proceed to the plain error review.” (Supp. R. on return to remand 28.) Thereafter, Lackey testified that he understands that he is incarcerated in prison for two convictions of capital murder and that he has been sentenced to death for both convictions. He has not had any problems understanding where he was or why he was in prison. He testified that he was alert during the hearing.
During the hearing, Lackey named the two attorneys who had represented him at trial. He testified that he met with those two attorneys often and consulted and assisted those attorneys during his trial.
Lackey testified that he knows his appellate counsel and understands what they do for him. According to Lackey, appellate counsel visited him every few months and discussed his case, including an issue involving Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Lackey explained that his appellate attorneys told him that a Batson issue arose *245 because the State “kicked off all the black jurors and ... that was illegal.” (Supp. R. on return to remand 37.)
Lackey testified that he does not want his conviction overturned and a new trial ordered. He stated that he understands the seriousness of capital crimes and knows that there are only two punishments — life in prison without the possibility of parole or death. He stated that he understands that in death-penalty cases, this Court “does an automatic review [and] looks over the transcript just to make sure everything was okay.” (Supp. R. on return to remand 38.) He explained that he understands that restricting this Court to plain-error review will limit this Court’s review of his convictions and sentences. Lackey stated that he knows that his chosen course of action will result in the issues raised by appellate counsel being stricken. Lackey also stated that he is aware that if this Court does not find any plain error, he will be executed by lethal injection.
Lackey stated that he does not want his conviction or sentence overturned because he accepts his guilt and because he does not want to face the possibility of being sentenced to life in prison without the possibility of parole. He explained that he understands what lesser-ineluded offenses are and that he could get a sentence of less than life in prison without the possibility of parole, but he does not want to take the chance of receiving a sentence of life in prison without the possibility parole. (Supp. R. on return to remand 43, 77.) Therefore, he wants to terminate counsel and have this Court conduct only a plain-error review. According to Lackey, he knows that if he represents himself and strikes all documents filed on his behalf, he will likely be executed.
Lackey stated that he wishes to terminate his appellate counsel and to represent himself because he has consistently told them since shortly after he was sentenced that he did not want to challenge his convictions or sentences. According to Lackey, appellate counsel have ignored his wishes and told him that he was “messing up their case.” (Supp. R. on return to remand 43.) Lackey’s testimony is supported by letters he has sent to the Alabama Attorney General and this Court. Further, this Court notes that, although Lackey informed appellate counsel shortly after he was sentenced to death that he did not want to challenge his convictions and sentences, appellate counsel did not raise any concerns relating to his competency until Lackey sought to represent himself and to terminate appellate counsel’s services.
At the hearing, Lackey informed the circuit court that he believed he had sufficient mental health to tell the court what he desires. He admitted that in August 2011 he attempted to commit suicide by cutting his wrists, but he explained that at that time, he was under a great deal of stress as a result of being on death row and his insomnia. Since that time, however, he has been on medication, and the medication has helped him, but it does not affect his judgment.[3] He further testified that his decision to proceed pro se, to terminate his counsel’s representation, and to strike all documents filed on his behalf is not an attempt to commit suicide. He explained that he is “just accepting guilt *246 for what [he] did[, and, although his appellate counsel say] its suicide, ... it’s not.” (Supp. R. on return to remand 47.)
In an attempt to remain on the case by showing that Lackey was incompetent, appellate counsel read from Dr. Preston’s report and argued that Lackey’s suicide attempt shows that he is incompetent. Appellate counsel also elicited testimony from Lackey indicating that he believes in a parallel universe. To rebut appellate counsel’s argument, the State explained that Dr. Preston found Lackey to be competent. Lackey explained that his past suicide attempt was the result of stress and insomnia and that those conditions no longer exist. Finally, Lackey testified that the parallel universe in which he believes is a spiritual world that consists of heaven and hell.
After the hearing, the circuit court issued an order in which it ruled that “Lackey is legally competent to exercise his right to proceed pro se and to control the course of his appellate proceedings.” (Supp. R. on return to remand 13.) The circuit court’s decision is supported by the record. Before trial, Lackey was found by Dr. Preston to be competent to stand trial, and it was Dr. Preston’s opinion that he would have no problems aiding his attorneys. At the hearing on his decision to represent himself, Lackey established that “he has sufficient present ability to consult with his lawyer[s, including trial counsel, appellate counsel, and new counsel,] with a reasonable degree of rational understanding and ... he has a rational as well as factual understanding of the proceedings against him.” Dusky, 362 U.S. at 402. See also Rule 11.1, Ala. R.Crim. P. Other than stress, depression, and insomnia, which, according to Lackey, have been successfully treated, there was no evidence indicating that Lackey suffers from mental disease, disorder, or defect that affects his ability to make a rational choice. See Hauser, 223 F.3d at 1322. To the contrary, Lackey’s testimony established that he understands the ramifications of proceeding pro se and striking all documents filed on his behalf, and he made a reasoned decision between accepting his guilt and punishment or taking the chance that he might be sentenced to life in prison without the possibility of parole. Rees v. Peyton, 384 U.S. at 314. Accordingly, this Court cannot say that the circuit court abused its discretion in finding that Lackey was competent to terminate appellate counsel’s service to him, to proceed pro se, and to strike all documents filed on his behalf.
B.
Next, this Court must review whether the circuit court correctly found that Lackey knowingly, intelligently, and voluntarily made his decision to waive counsel, to proceed pro se, and to strike all documents filed on his behalf in this Court. Johnson, 40 So.3d at 756-57; Sibley, 775 So.2d at 240; Block, 744 So.2d at 406.
In Faretta v. California, 422 U.S. 806, 819-22, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court explained that, although a defendant has a right to represent himself and to waive the assistance of counsel, the intelligence of the waiver of counsel must be scrutinized.[4] “When an [appellant] manages his own [appeal], he relinquishes ... many of the traditional benefits associated with the right to counsel.” Id. at 835. *247 Because an appellant who invokes his state-law right to represent himself and chooses to strike all documents previously filed on his own behalf waives many traditional benefits, “in order to represent himself the [appellant] must ‘knowingly and intelligently’ forgo those relinquished benefits ... [and] he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that ‘he knows what he’s doing and his choice is made with eyes open.’ ” Sibley, 775 So.2d at 242-43 (quoting Faretta, 422 U.S. at 835. “While it is desirable that the trial court engage, as it did in this case, in a colloquy in which it expressly advises the defendant of ‘the dangers and disadvantages of self-representation,’ such a colloquy is not mandated.” Moody v. State, 888 So.2d 532, 554 (Ala.Crim.App.2003) (quoting Tomlin v. State, 601 So.2d 124, 128 (Ala.1991)). “The ultimate test is whether it ‘appearfs] from the record as a whole that a defendant’s waiver of counsel and decision to represent himself were knowing and intelligent.’ ” Moody, 888 So.2d at 554 (quoting Teske v. State, 507 So.2d 569, 571 (Ala.Crim.App.1987)). “Under this approach, the focus of the inquiry is on ‘the particular facts and circumstances involved, “including the background, experience, and conduct of the accused.”’” Moody, 888 So.2d at 554 (quoting Tomlin, 601 So.2d at 128-29, quoting in turn, Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).
In Sibley v. State, this Court held that the circuit court may consider the following nonexclusive factors in determining whether an appellant’s decision to represent himself and, in that case, refusal to file a brief was knowing and voluntary:
“ ‘(1) [T]he background, experience and conduct of the defendant including his age, educational back ground, and his physical and mental health; (2) the extent to which the [appellant] had contact with lawyers prior to the [appeal]; (3) the defendant’s knowledge of the nature of the charges, the possible defenses, and the possible penalty; (4) the defendant’s understanding of the rules of procedure, evidence and courtroom decorum; (5) the defendant’s experience in criminal trials; (6) ... whether the waiver of counsel was the result of mistreatment or coercion; or ([7]) whether the defendant was trying to manipulate the events of the [appeal].’ ”
775 So.2d at 239 (quoting Strozier v. Newsome, 871 F.2d 995, 998 (11th Cir.1989)). See also United States v. Cash, 47 F.3d 1083, 1088-89 (11th Cir.1995) (same factors). “ ‘ “All factors need not point in the same direction.” ’ ” Johnson, 40 So.3d at 757-58; Sibley, 775 So.2d at 243 (quoting Cash, 47 F.3d at 1089).
After reviewing the record on return to remand, this Court is convinced that Lackey’s decision to represent himself on appeal, to terminate counsel’s representation, and to strike all documents filed on his behalf was knowing and voluntary. During the hearing, Lackey testified that he is 28 years old, that he graduated from high school, and that he attended Calhoun Community College for almost 2 years. Lackey can read and write, and he has no difficulty understanding the English language. Lackey stated that he was physically in good shape and was not suffering from any mental health issues that would prevent him from explaining what he wants to occur in his appeal.
Lackey informed the circuit court that he understands that he has been convicted of two counts of capital murder and has been sentenced to die for each conviction. According to Lackey, he knows that if he terminates appellate counsel’s representa *248 tion, represents himself, and strikes all documents file on his behalf, this Court will review the trial transcript for plain error only. He stated that he knows his actions will likely result in his being executed. He explained that he does not want to challenge his convictions and sentences because he accepts his guilt and does not want to take the chance that he might receive a sentence of life in prison without the possibility of parole.
Lackey testified that he has met with appellate counsel many times and that he has had no problems communicating with them. He stated that he informed appellate counsel shortly after they became involved in his appeal that he did not want to challenge his convictions or sentences, but appellate counsel filed a brief against his wishes. Lackey explained that he wants to terminate appellate counsel’s employment and to represent himself because appellate counsel have ignored his instructions not to challenge his convictions and sentences. The record establishes that Lackey has sought help from the Alabama Attorney General, this Court, and new retained counsel in removing appellate counsel and effectuating his desire not to challenge his convictions and sentences.
Lackey informed the circuit court that he had not been threatened or coerced into invoking his right to represent himself and striking the documents that have been filed on his behalf. He stated that he has not been promised anything or offered any inducement to take the actions he seeks to take. Lackey testified that he understands that, if this Court does not overturn his convictions or sentences, his actions will “greatly accelerate the time in which [his] execution date [will] be set and carried out.” (Supp. R. on return to remand 46.) Lackey stated that he knows that firing appellate counsel and striking all documents filed on his behalf will “likely result in [his] convictions [being] upheld and [his] death sentenced] being carried out.... ” (Supp. R. on return to remand 55.) Upon questioning by the court, Lackey stated that he understands that if his convictions and sentences are reversed, it is possible that he could ultimately be convicted of a lesser-included offense and receive a sentence of less than life in prison without the possibility of parole. Lackey, however, testified that he did not want to take the chance of receiving a sentence of life in prison without the possibility of parole.
Lackey testified that he basically understands plain-error review and that he understands the Alabama Rules of Criminal Procedure. Lackey testified that he knows that the Alabama Rules of Appellate Procedure can be very complicated, and his decision to represent himself and to strike all briefs could adversely affect future collateral challenges to his convictions or sentences. The circuit court fully explained to Lackey the consequences, dangers, and disadvantages of self-representation and striking all appellate documents, and Lackey stated that he is aware of those consequences, dangers, and disadvantages.
During the hearing, the circuit court strongly advised Lackey against firing his appellate counsel and striking the briefs and other documents filed on his behalf, but Lackey insisted that that is his desire. At the conclusion of the hearing, the circuit court found that Lackey knowingly, intelligently, and voluntarily made the decision to represent himself, to terminate appellate counsel’s employment, and to strike all documents filed on his behalf. The record fully supports the circuit court’s conclusion. Therefore, the circuit court did not err in finding that Lackey knowingly, intelligently, and voluntarily made his decision.
*249 C.
Based on the extensive colloquy between the circuit court and Lackey and Lackey’s questioning by counsel, this Court is convinced that Lackey “ ‘not only [competently,] knowingly, intelligently, and voluntarily, waive[d] his right to counsel, but also [chose to strike all documents filed on his behalf].’ ” Johnson, 40 So.3d at 758 (quoting Sibley, 775 So.2d at 243). This Court is further convinced that when Lackey “ ‘decided to [strike the briefs filed on his behalf and restrict this Court’s] review of his conviction and death sentence [to plain error] he could appreciate his position and he knew that his life was at stake.’ ” Johnson, 40 So.3d at 758 (quoting Sibley, 775 So.2d at 244). Therefore, the circuit court did not err by granting Lackey’s motion to terminate appellate counsel’s employment, to represent himself, and to strike all documents filed on his behalf.[5]
II.
Next, this Court must review the sufficiency of the State’s evidence to sustain Lackey’s two capital-murder convictions. Lackey was convicted of capital murder pursuant § 13A-5-40(a)(2), Ala. Code 1975, which required the State to prove that he intentionally murdered Charles Newman during the course of a robbery, and he was convicted of capital murder pursuant to § 13A-5-40(a)(4), Ala. Code 1975, which required the State to prove that he intentionally murdered Charles Newman during the course of a burglary.
“In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” Powe v. State, 597 So.2d 721, 724 (Ala.1991) (citing Faircloth v. State, 471 So.2d 485, 489 (Ala.Crim.App.1984)). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997) (quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992)). “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” Sale v. State, 8 So.3d 330, 338 (Ala.Crim.App.2008) (quotations and citations omitted). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Stewart, 900 So.2d 475, 477 (Ala.2004) (citations and quotations omitted). Further, in a capital case in which the defendant pleads guilty, “[t]he guilty plea may be considered in determining whether the state has met [its] burden of proof.” § 13A-5-42, Ala.Code 1975. Applying these principles, this Court holds that the State presented sufficient evidence to sus *250 tain Lackey’s two capital-murder convictions.
At trial, the State presented evidence indicating the following. At 7:34 p.m. on October 31, 2005, the Athens Police Department received and recorded an emergency telephone call that originated from Charles Newman’s house. During that telephone call, Newman could be heard stating, “Don’t do that” and “Leave me alone.” (State’s exhibit # 1.) Newman also asked, “What do you want?” Id. His assailant, who could be overheard on the recording, responded repeatedly by asking, “Where’s the vault?” Id.
Detective Katrina Flannigan, then a patrol officer with the Athens Police Department, was dispatched to Newman’s house following the emergency telephone call. When she did not receive an answer at the front door, Detective Flannigan went to the rear of the residence. Detective Flan-nigan noticed that, although the glass storm door was closed, the wooden back door was open and that there was blood on the storm door.
Detective Flannigan summoned the officer with her to the back. The officer told her that he could see a body inside the house, so they entered Newman’s house through the back door. Inside, they found Newman’s body on the floor between a couch and a green chair, and a large puddle of blood. Underneath the chair was a set of dentures and the base to a cordless telephone. Detective Flannigan noticed bloody shoe prints leading to the back door from the body and could smell the scent of gunpowder.
Later that evening, Officer William Watson, Officer Bobby McCalphin, and Sgt. Clayton Jordan of the Madison Police Department responded to a shooting victim who telephoned the police from a Chevron gasoline station. The officers arrived to find Lackey sitting outside on a curb. Lackey told Officer Watson that he had been shot, and Lackey lifted his shirt. Officer Watson saw two gunshot wounds, one in the center of Lackey’s chest and another on the side of his chest. When asked how he was shot, Lackey responded, “ T have no idea. I don’t know anything. I just know I’ve been shot.’” (R. 566.) Lackey would not explain where he was when he was shot, nor would he explain how he came to be at the gasoline station.
Officer Watson saw a white Nissan Alti-ma automobile parked in front of the gasoline station. Officer Watson’s attention was drawn to the Altima because of blood on the Altima’s exterior. Looking through the windows, Officer Watson could see blood on the steering wheel and front dash, what appeared to be an insulated pizza bag and a radio scanner in the front-passenger seat, two pistols in the front-passenger floorboard, and a bloody knife with a broken tip in the rear floorboard.
Sgt. Jordan telephoned sheriffs departments and police stations in neighboring counties to determine if there had been any reported shootings that evening. The Athens Police Department responded that it was investigating a shooting, and Sgt. Jordan informed the Athens Police Department about Lackey and his vehicle.
During a search of the Altima, officers found a Rossi brand .38 revolver; an 8mm starter pistol; a knife with a broken tip; an insulated pizza bag; a police scanner; a rental agreement for the Altima signed by Lackey; a stun gun with a missing electrode; a baseball batting glove; a utility belt; two flashlights; two black tube socks filled with nylon rope; a pack of six bottles of super glue; two black gym bags; a pair of blood-stained eyeglasses; an axe; a sledgehammer; a hammer with a towel wrapped around it; a roll of duct tape; five screwdrivers; several packs of batter *251 ies; a pair of night-vision goggles; and a wallet, which contained Lackey’s driver’s license, several credit cards in his name, and a Paypal card in the name of “Jacob McDeal.” Lackey’s mother testified that Lackey had incorporated his Internet-sales business under the name “Jacob McDeal.”
Officer Jay Looney of the Athens Police Department collected two one-dollar bills and a receipt from a Long John Silver’s restaurant from Newman’s house. The bills and receipt were found folded together near the back door. The receipt reflected an order of a chicken sandwich and chili-cheese fries. He also recovered a piece of metal that was believed to be an electrode from the stun gun found in the Altima. In a box sitting on the fireplace mantel, Officer Looney found a bill of sale for Newman’s purchase of the Rossi brand .38 revolver. Doris Langster, Newman’s friend, testified that she sold the Rossi .38 revolver to Newman and that he typically carried the revolver in a pocket in his robe.
Dr. Emily Ward, a pathologist with the Alabama Department of Forensic Sciences (“DFS”), performed the autopsy on Newman. Dr. Ward found that Newman suffered a combination of 54 stab wounds and lacerations to his head, including stab wounds to both eyes, and a broken nose. Newman had seven wounds on his neck, one of which severed his carotid artery, and multiple cuts to his hands. Newman also sustained a gunshot wound. The entrance wound was on the right side of his chest, and the exit wound was on the left side of his chest. Dr. Ward testified that the exit wound was surrounded by purple discoloration, indicating that Newman was against a hard object, such as the floor, when he was shot. Additionally, the entrance wound was surrounded by gunpowder, indicating that the pistol was at a close range when fired. In Dr. Ward’s opinion, Newman died as a result of numerous sharp and blunt-force injuries of the head and neck and a gunshot wound to the chest. Dr. Ward also testified, though, that Newman was likely dead prior to being shot.
A subsequent investigation revealed that Lackey was a long-time friend Newman’s grandson Derrick Newman. Derrick Newman testified at trial that he had previously told Lackey of Newman’s wealth and that Newman had a vault in his house. Derrick Newman told Lackey that the vault could be accessed by a door next to the stairwell. Additionally, Derrick Newman testified that he and Lackey had been to a Long John Silver’s restaurant two days before his grandfather’s murder and that Lackey had ordered a chicken sandwich and chili-cheese fries.
The computers at Lackey’s apartment were seized. Brian Wilmoth, a computer-forensics analyst with the Regional Organized Crime Information Center, was asked by Lt. Floyd Johnson to analyze the computer hardware recovered from Lackey’s apartment. Wilmoth recovered messages sent from “Jacob” to “Damian”[6] from January 2005 through July 2005. Within the messages, “Jacob” wrote to “Damian” about an impending heist; his reconnaissance of the target, the house of an “old rich guy,” and its vulnerabilities; his collection of supplies for the heist; the cash and gold he believed was in the house; his intention to use a pizza bag as a ploy to gain entry into the house; and his desire for money. (C. 298-318.) Also, within Lackey’s computer’s Internet history, Wilmoth found a previous search of Newman’s address.
Robert Bass, who was a forensic scientist with the DFS, analyzed several pieces *252 of bloodstained evidence collected from Newman’s house and from the Altima. Bass testified that Lackey was a DNA match for bloodstains found on the sweatshirt he was wearing on the night of the murder, on the steering wheel of the Alti-ma, on the interior of the back door to Newman’s house, and on the storm door on the rear of Newman’s house. Newman was a DNA match for bloodstains found on the exterior of the back door to his house and on the interior of the storm door. Bass also testified that there was a mixed-DNA profile on the trigger guard on the Rossi .38 revolver, on the trigger on the starter pistol, and on the hand brake lever on the Altima, and that Newman and Lackey were the likely contributors of that DNA.
Crystal Kissel, a forensic scientist with the DFS, testified that Newman was a DNA match for bloodstains found on the soles of the boots Lackey was wearing on the night of the murder.
Jacquelyn Bowling, a forensic scientist with the DFS, testified that Newman and Lackey were DNA matches for various bloodstains on the blue jeans Lackey was wearing on the night of the murder.
John Kilbourn, a forensic scientist with Analytical and Forensic Associates, examined the bloody shoe prints found near Newman’s body. Kilbourn concluded that the shoe prints were made by a sole that had an identical sole pattern and were the same length and width as the left boot Lackey was wearing on the night of the murder.[7]
Tammy Sligh, a forensic scientist with the DFS, testified that a piece of metal that was lodged in Newman’s skull, which was found during the autopsy, was the tip of the knife found in the Altima. She also confirmed that the three bullets and one bullet jacket recovered from Newman’s house had been fired from the Rossi .38 revolver. All five cartridges that remained in the revolver had been fired.
Here, the State presented an ironclad case establishing Lackey’s guilt, and its evidence overwhelmingly established that Lackey intentionally murdered Newman during the course of a burglary and a robbery. §§ 13A-5-40(a)(2) and (a)(4), Ala.Code 1975. Because the State met its burden of proof, Lackey is not entitled to any relief.
III.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of Lackey’s convictions and his sentence of death. Lackey was indicted for, and convicted of, two counts of capital murder — one count of capital murder for the murder of Newman during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975, and one count of capital murder for the murder of Newman during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975.
The record does not reflect that Lackey’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In making this determination, the circuit court found that the State proved the existence of the following three aggravating circumstances: 1) that the capital offense was committed while Lackey was engaged in the commission of a burglary, see § 13A-5^9(4), Ala.Code 1975; 2) that the *253 capital offense was committed while Lackey was engaged in the commission of a robbery, see § 18A-5-49(4), Ala.Code 1975; and 3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975.
Regarding mitigating circumstances, the circuit court found that the defense established one statutory mitigating circumstance — that Lackey had no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975. The circuit court also found the following nonstatutory mitigating circumstances: 1) that Lackey was “different” in that he lived in a world of computer games; 2) that Lackey was shy, introverted, and socially awkward with few friends; 3) that Lackey, at a young age, was distant, cold, and detached; 4) that Lackey’s family members testified that Lackey was a kind, good child, and that he did not bully other children; 5) that Lackey’s family moved frequently when he was a young child, causing Lackey to change schools and preventing Lackey from becoming established with a doctor; 6) that Lackey seemed younger than his chronological age; 7) that Lackey was easily influenced by others, so that often Lackey may not fully appreciate the reality of what he was doing; 8) that Lackey absolved Derrick Newman during the penalty phase, which the circuit court viewed as a gesture of kindness.
The sentencing order shows that the circuit court properly weighed the aggravating circumstances and the mitigating circumstances and correctly sentenced Lackey to death. The record supports the circuit court’s findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating circumstances and the mitigating circumstances to determine whether Lackey’s sentence of death is proper. After independently weighing the aggravating circumstances and the mitigating circumstances, this Court finds that Lackey’s death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must now determine whether Lackey’s sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. Lackey was convicted of one count of murder during a robbery and one count of murder during a burglary. Further, the circuit court found that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. A sentence of death has been imposed for similar crimes throughout this State. See Melson v. State, 775 So.2d 857, 863 (Ala.Crim.App.1999); Washington v. State, 922 So.2d 145 (Ala.Crim.App.2005); Brown v. State, 11 So.3d 866, 901 (Ala.Crim.App.2007). Therefore, this Court finds that the sentence was neither excessive nor disproportionate.
Finally, this Court has meticulously searched the entire record for any error, plain or preserved below, that may have adversely affected Lackey’s substantial rights. This Court has found no merit to any issue preserved below for appellate review and no indicia of plain error. See Rule 45A, Ala. R.App. P.
Accordingly, Lackey’s convictions and his sentences of death are affirmed,
AFFIRMED.
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.

. Lackey raises numerous additional issues on appeal. Because Lackey’s Batson issue may be dispositive, this Court pretermits discussion of those additional issues.

. James Barry Abston was appointed to represent Lackey on appeal. At some point shortly thereafter, Randall S. Susskind and Kristen M. Nelson, with the Equal Justice Initiative, joined Lackey’s appellate defense team. It does not appear that the attorneys from the Equal Justice Initiative were appointed to represent Lackey; instead, they appear to have injected themselves into the litigation.

. After interviewing Lackey’s parents and his brother, Dr. Preston hypothesized that Lackey might suffer from Asperger’s Syndrome, but he was unable to confirm or disprove his hypothesis through examinations of Lackey.

. At the hearing, appellate counsel stated that the fact that Lackey had been prescribed and was taking psychotropic drugs is evidence that he is incompetent. The record, however, does not establish whether Lackey was taking psychotropic drugs, antidepressant drugs, sleep aides, or some other type of drug. Accordingly, appellate counsel’s assertion is unsupported by any evidence in the record.

. This Court recognizes that Faretta is not directly on point because that case involved a defendant's right to represent himself at trial. 422 U.S. 806. However, in Sibley and Johnson, this Court analogized the waiver of counsel at trial and the waiver of counsel on appeal.

. On July 23, 2012, after the circuit court granted Lackey’s motion to represent himself and to terminate appellate counsel’s employment, appellate counsel filed a motion in this Court asking this Court to remand the cause to the circuit court with instructions for it to hold another hearing on Lackey's competency and his decision to waive counsel and to represent himself. This Court returned appellate counsel’s motion because they failed to serve Lackey, who now represents himself, or the attorney Lackey hired to help him terminate appellate counsel's employment, and because appellate counsel no longer represent Lackey.

. At trial, “Damian” was identified as an individual who lived in England.

. Kilboum was unable to definitively state that the shoe print was made by Lackey's boot because of the uneven nature of the linoleum flooring on which the shoe print was made.